**Mark Robert QUIROZ, Plaintiff,**

v.

**Robert A. HOREL, et al., Defendants.**

**No. C 11–0016 LHK (PR)**

United States District Court,
N.D. California.

Signed March 31, 2015

Mark Robert Quiroz, Tehachapi, CA, pro se.

Donn Robert Duncan, II, Danielle Felice O'Bannon, Attorney General's Office, San Francisco, CA, for Defendants.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; REFERRING CASE TO SETTLEMENT PROCEEDINGS

(Docket Nos. 267, 291)

LUCY H. KOH, District Judge

Plaintiff, a state prisoner proceeding *pro se,* filed a third amended complaint under 42 U.S.C. § 1983, arguing that prison official defendants violated his federal and state law rights. Defendants have filed a motion for summary judgment.[1] Defendants have also filed a supplemental brief. (Docket No. 290.) Plaintiff has filed an opposition.[2] Defendants have filed a reply. Having carefully considered the papers submitted, the court GRANTS in part and DENIES in part defendants' motion for summary judgment.[3]

## BACKGROUND

In the third amended complaint, plaintiff alleges that defendants are Institutional Gang Investigators ("IGI") of the Investigative Services Unit ("ISU") at Pelican Bay State Prison ("PBSP"). The IGI officers are often tasked with inspecting incoming and outgoing mail. Plaintiff complains that defendants conspired with each other and retaliated against plaintiff for exercising his First Amendment right to file grievances and lawsuits. Specifically, plaintiff alleges that defendants: (1) violated plaintiff's First Amendment right to be free from retaliation; (2) conspired with other defendants to violate plaintiff's constitutional rights; and (3) violated state law.[4] In response, defendants argue that: (1) a portion of the claims are unexhausted; (2) a portion of the claims are barred by the statute of limitations; and (3) de-

1. Defendant Short has filed a separate motion for summary judgment, which has been addressed in a separate order.

2. Plaintiff's motion for leave to exceed the page limit is GRANTED. (Docket No. 291.)

3. For the claims upon which the court grants summary judgment on the merits, it will not address defendants' additional argument that they are entitled to qualified immunity.

4. In the third amended complaint, plaintiff also alleged that IGI Correctional Officer Countess violated plaintiff's constitutional right to marry, right to familial relationships, and right to association. However, in plaintiff's opposition, plaintiff states that he is voluntarily dismissing those claims against Countess. (Opp. at 4.) Thus, pursuant to Federal Rule of Civil Procedure 41(a)(2), plaintiff's claims against Countess regarding the right to marry, right to familial relationships, and right to association are DISMISSED without prejudice.

fendants are otherwise entitled to summary judgment on the merits, and based on qualified immunity.[5]

The following facts are taken in the light most favorable to plaintiff.

Plaintiff has been confined in PBSP's Secure Housing Unit ("SHU") since February 1992. (Third Am. Compl. ¶ 23.) Since 1991, plaintiff has been an active, validated member of the Mexican Mafia prison gang. (Countess Decl. ¶ 7.) The Mexican Mafia prison gang is responsible for a variety of illegal activity within PBSP and other prisons, and is considered a continuing security threat within the California prison system. (*Id.* ¶ 6.) The Mexican Mafia is also affiliated with other prison gangs and street gangs, and promotes violence as a way of resisting prison officials' authority within prisons. (*Id.*)

On July 19, 2005, plaintiff filed a federal civil rights complaint in *Quiroz v. Woodford,* No. 05–2938 JF (N.D. Cal.) ("*Quiroz I* "). (Third Am. Compl. ¶ 26.) From 2006 through April 2012, plaintiff filed 59 administrative grievances against IGI officers alleging a variety of offenses. (Opp. at 37.) In 2007, plaintiff also participated in a staff complaint filed by another inmate named Sandoval against IGI officers. (Third Am. Compl. ¶ 38.) In 2009, plaintiff submitted a declaration in support of Sandoval in a federal civil rights complaint against IGI officers for excessive force in *Sandoval v. Barneburg,* No. 08–865 JSW (N.D. Cal. filed Feb. 8, 2008) ("*Sandoval* "). (Third Am. Compl. ¶¶ 38, 61.) Plaintiff's underlying federal civil rights complaint claims that defendants, who are all PBSP prison officials, retaliated against him for filing *Quiroz I,* participating in Sandoval's staff complaint, submitting a declaration in support of *Sandoval,* and

filing administrative grievances against IGI officers.

The court will set forth more specific facts giving rise to each of plaintiff's claims below.

## ANALYSIS

### I. *Standard of Review*

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548.

Once the moving party meets its initial burden, the nonmoving party must go be-

---

**5.** Defendants also raised an argument that one of plaintiff's retaliation claims was barred by *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). Defendants have now withdrawn that argument. (Reply at 1 n.3.)

yond the pleadings, and by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The court is only concerned with disputes over material facts, and "factual disputes that are irrelevant or unnecessary will not be counted." *Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir.1996). The non-moving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548.

At the summary judgment stage, the court must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir.1999).

## II. *Exhaustion*

Defendants argue that plaintiff failed to exhaust his claims that defendants IGI Correctional Officer Countess, ISU Captain Brandon, and ISU Captain McGuyer retaliated against plaintiff by stopping incoming mail to plaintiff on February 20, 2007 and September 20, 2007, and John Doe III retaliated against plaintiff by intentionally discarding a piece of plaintiff's outgoing mail in November 2007.[6] (MSJ at 14.) Plaintiff's third amended complaint is silent regarding whether plaintiff attempted to exhaust these claims.[7]

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Nonexhaustion under § 1997e(a) is an affirmative defense; that is, defendants have the burden of raising and proving the absence of exhaustion. *See Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir.2014) (en banc).

Defendants state that the prison has no record that plaintiff initiated the grievance process regarding the February 20, 2007 or September 20, 2007 stopping of mail, or the November 2007 discarding of plaintiff's outgoing mail. Plaintiff concedes that he failed to file any grievances exhausting the above three claims. (Opp. at 9.) Because the undisputed evidence, viewed in the light most favorable to plaintiff, shows that plaintiff failed to exhaust these claims, defendants are entitled to summary judgment on plaintiff's claims that defendants retaliated against him by stopping plaintiff's mail on February 20, 2007, Septem-

---

**6.** Defendants argue that plaintiff failed to exhaust his claim that an unknown IGI officer retaliated against plaintiff by discarding plaintiff's outgoing mail in November 2007. (Third Am. Compl. ¶ 42.) However, plaintiff merely alleges that "John Doe III" discarded the mail. It does not appear that plaintiff has included this allegation within his "causes of action." Specifically, plaintiff's claim of retaliation names many defendants, but does not include "John Doe III." Nonetheless, out of an abundance of caution, the court will assume that plaintiff intended to include this claim in his third amended complaint.

**7.** Defendants argue that plaintiff's claim that Appeals Coordinator Wilber retaliated against plaintiff by improperly processing plaintiff's grievance on May 20, 2008, is unexhausted. (MSJ at 16.) However, defendants have now withdrawn this argument. (Reply at 2, n.5.)

ber 20, 2007, and discarding a piece of outgoing mail in November 2007. *See id.*

### III. *Statute of Limitations*

Defendants argue that plaintiff's claims regarding events that occurred prior to 2007 are barred by the statute of limitations. (MSJ 17–19.) Specifically, defendants assert that the following claims are untimely: (1) IGI Lieutenant D. Barneburg, Correctional Counselor Hernandez, and non-defendant Marquez impermissibly confiscated plaintiff's personal property in 2004 (Third Am. Compl. ¶ 24); (2) McGuyer and Countess interfered with plaintiff's ability to send and receive mail in October, November, and December 2006 (*id.* ¶¶ 27–35); and (3) McGuyer and Wilber mishandled an administrative grievance in October and November 2006 (*id.* ¶¶ 8–9, 29–30, 32). Plaintiff responds that the impermissible confiscation of his personal property in 2004 was not intended to be a claim. (Opp. at 13.) Plaintiff further states that he is voluntarily dismissing the claims that McGuyer and Countess interfered with plaintiff's ability to send and receive mail in October, November, and December 2006, and that McGuyer and Wilber mishandled an administrative grievance in October and November 2006.

Accordingly, these claims are DISMISSED without prejudice.

### IV. *Merits*

#### A. *Retaliation*

Plaintiff alleges that defendants retaliated against him in the following ways for exercising plaintiff's First Amendment rights: (1) by stopping plaintiff's incoming and outgoing letters; (2) by delaying plaintiff's incoming mail; (3) by withholding prisoner declarations; (4) by issuing a Rules Violation Report ("RVR") against plaintiff; (5) by failing to provide plaintiff notice that a Superior Court would be seizing his funds; and (6) by searching plaintiff's cell and removing paperwork. The court will address each incident in turn.

■ "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson,* 408 F.3d 559, 567–68 (9th Cir.2005) (footnote omitted).

■ The prisoner must show that the type of activity in which he was engaged was constitutionally protected, that the protected conduct was a substantial or motivating factor for the alleged retaliatory action, and that the retaliatory action advanced no legitimate penological interest. *Hines v. Gomez,* 108 F.3d 265, 267–68 (9th Cir.1997) (inferring retaliatory motive from circumstantial evidence). Retaliatory motive may be shown by the timing of the allegedly-retaliatory act and other circumstantial evidence, as well as direct evidence. *Bruce v. Ylst,* 351 F.3d 1283, 1288–89 (9th Cir.2003). However, mere speculation that defendants acted out of retaliation is not sufficient. *Wood v. Yordy,* 753 F.3d 899, 904 (9th Cir.2014) (citing cases) (affirming grant of summary judgment where there was no evidence that defendants knew about plaintiff's prior lawsuit, or that defendants' disparaging remarks were made in reference to prior lawsuit).

#### 1. *Stopping incoming and outgoing letters*

Defendants argue that there is an absence of evidence of a causal connection that the stopping of plaintiff's incoming and outgoing letters was motivated because of plaintiff's protected conduct. De-

fendants further argue that there were legitimate reasons for disallowing plaintiff's mail. Plaintiff claims that defendants stopped these incoming and outgoing letters because plaintiff filed *Quiroz I,* participated in Sandoval's staff complaint, submitted a declaration in support of *Sandoval,* and filed administrative grievances.

To raise a triable issue as to motive, plaintiff must offer evidence that defendants knew about the protected conduct. *Corales v. Bennett,* 567 F.3d 554, 568 (9th Cir.2009). In addition, plaintiff must show "either direct evidence of retaliatory motive or at least one of three general types of circumstantial evidence [of that motive]." *McCollum v. California Dept. of Corrections and Rehabilitation,* 647 F.3d 870, 882 (9th Cir.2011) (quoting *Allen v. Iranon,* 283 F.3d 1070, 1077 (9th Cir.2002)). To survive summary judgment without direct evidence, therefore, plaintiff must "present circumstantial evidence of motive, which usually includes: (1) proximity in time between protected speech and the alleged retaliation; (2) [that] the [defendant] expressed opposition to the speech; [or] (3) other evidence that the reasons proffered by the [defendant] for the adverse ... action were false and pretextual." *McCollum,* 647 F.3d at 882 (internal quotation marks and citation omitted).

### A. *June 2008 incoming letter from Yvette Asahi*

On June 9, 2008, Countess and Brandon stopped an incoming letter to plaintiff from Yvette Asahi. (Third Am. Compl. ¶ 54.) The reason given for the confiscation was because the letter was considered third party correspondence and used a fictitious name or address. (*Id.*) Plaintiff challenged the stop in an administrative grievance. In the administrative grievance, plaintiff explained that Ms. Asahi lived with her cousin, Vivian Chavez, and Ms. Chavez was plaintiff's girlfriend. In addition, plaintiff asserts that on May 30, 2008, Countess inserted a note in a birthday card that Ms. Chavez sent to plaintiff, and the note stated "you are being advised that any further correspondence that contains perfume such as this will be stopped and you will not receive it. Your assistance informing the author of the correspondence is to your benefit if you wish to continue to correspond with her." (*Id.*) Plaintiff argued that corresponding with people from the same residence was not in violation of any policy. Warden Horel denied plaintiff's administrative grievance. (*Id.*) Plaintiff claims that Countess and Brandon confiscated the June 2008 incoming letter from Ms. Asahi because plaintiff filed *Quiroz I,* participated in Sandoval's staff complaint, submitted a declaration in support of *Sandoval,* and filed administrative grievances.

In response, Countess states that he stopped two pieces of incoming mail from "Y. Asahi and Ruben and Yvette Asahi" which originated from Ms. Chavez's address. (Countess Decl. ¶ 15.) Countess deemed the mail "third party correspondence" because the letters appeared to be written by someone other than the person who wrote the envelope, one envelope was postmarked three weeks after one of the letters was dated, and the two letters seemed to be written by two different people. (*Id.*) Moreover, Ms. Chavez's address had been identified as a "drop box" address for communications with plaintiff other than by Vivian Chavez. (*Id.*) Prison officials prohibit third party correspondence to prevent inmate to inmate correspondence. (*Id.* ¶ 13.) The IGI officers stop mail as third party correspondence if the envelope and the letter are obviously written by different people. (*Id.*) The prison has a legitimate security interest in preventing such correspondence, particularly gang member to prison gang member

communication. (*Id.*) Moreover, the use of "drop boxes" is an unauthorized practice where an inmate sends or receives mail to an outside address where the mail can be routed from one inmate to another after persons at that outside address repackage the original mail and send it back to the prison. (*Id.* ¶ 12.) Because "drop boxes" facilitate inmate to inmate correspondence, mail to or from that address is generally prohibited to ensure prison security. (*Id.*)

Plaintiff asserts that Countess stopped this letter, and Brandon approved the stop, because plaintiff filed *Quiroz I,* participated in Sandoval's staff complaint, submitted a declaration in support of *Sandoval,* and filed an administrative grievance on January 2, 2008, challenging Countess' disallowance of incoming correspondence from an unidentified party (*id.* ¶ 45).[8] (*Id.* ¶ 54.) However, plaintiff provides no non-speculative evidence of retaliatory motive. *See McCollum,* 647 F.3d at 882.

■ First, there is no evidence that Countess or Brandon knew that plaintiff filed *Quiroz I,* participated in Sandoval's staff complaint, submitted a declaration in support of *Sandoval,* or filed administrative grievances. Plaintiff alleges that he "put the defendants on notice that [ ] Countess was messing with his mail and was singling out [plaintiff] out of vindictiveness behind his lawsuit filed against the IGI [officers in *Quiroz I* ]." (Third Am. Compl. ¶ 54.) However, Countess was not named as a defendant in *Quiroz I,* and there is no other plausible evidence that Countess knew about *Quiroz I.* Plaintiff

also alleges that Brandon knew about *Quiroz I.* However, Brandon was also not named as a defendant in that lawsuit, and there is no other evidence to infer that Brandon otherwise was aware of it. Plaintiff states that he gave Brandon "notice" that plaintiff began having "all of these problems" after plaintiff filed *Quiroz I.* (Third Am. Compl. ¶ 54.) However, there is an absence of evidence as to when plaintiff gave Brandon "notice," and specifically, whether plaintiff gave Brandon notice of *Quiroz I* prior to the June 9, 2008 stopping of Ms. Asahi's incoming letter.

■ In addition, even assuming that Countess and Brandon knew that plaintiff filed *Quiroz I,* participated in Sandoval's staff complaint, submitted a declaration in support of *Sandoval,* and filed administrative grievances, there is no proximity in time between plaintiff's filing of *Quiroz I* in 2005, plaintiff's participation in Sandoval's staff complaint in 2007, or any specific administrative grievance against which defendants allegedly retaliated. *Quiroz I* was filed in 2005, approximately three years prior. The 2007 Sandoval staff complaint also occurred over one year prior to this challenged stopping of mail on June 9, 2008. *See Vasquez v. Cnty. of Los Angeles,* 349 F.3d 634, 646 (9th Cir.2004) (recognizing that a thirteen month lapse is too long to support an inference of causality). However, plaintiff's January 2008 administrative grievance which challenged Countess' disallowance of an incoming piece of mail to plaintiff from an unidentified party

---

**8.** In plaintiff's opposition, he expands his claim by alleging that Countess retaliated against him because plaintiff filed not only the January 2008 grievance regarding stopped mail, but also ten additional grievances against IGI/ISU officers. (Opp. at 21.) However, plaintiff improperly raises these theories for the first time in his opposition. As such, these new allegations will not be considered. *See Pickern v. Pier 1 Imports Inc.,* 457 F.3d

963, 968–69 (9th Cir.2006) (affirming a district court's refusal to consider at the summary judgment stage factual allegations not pled in the complaint); *Patel v. City of Long Beach,* No. 09–56699, 564 Fed.Appx. 881, 882 (9th Cir. March 19, 2014) (affirming district court's rejection of plaintiff's new theory, raised for the first time in opposition to summary judgment) (unpublished memorandum disposition).

occurred close to six months prior to the confiscation of the underlying June 9, 2008 incoming letter from Ms. Asahi. (Third Am. Compl. ¶ 45.) Though six months may support an inference of retaliation, *see Coszalter v. City of Salem,* 320 F.3d 968, 977 (9th Cir.2003), it is usually insufficient by itself to support a finding of retaliatory motive, *see Pratt v. Rowland,* 65 F.3d 802, 808 (9th Cir.1995). In order to establish a causal link sufficient to survive summary judgment based solely on temporal proximity, the protected activity and the adverse action must be "very close." *Clark County School District v. Breeden,* 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam) (citing cases finding periods of three and four months too long).

There is no evidence that Countess or Brandon expressed opposition to plaintiff's protected conduct. In addition, plaintiff offers no evidence that Countess' reasons for concluding that the incoming mail was "third party correspondence" was false or pretextual. *See Wood,* 753 F.3d at 904–05 (speculation on defendant's motive is insufficient to defeat summary judgment). Plaintiff does not dispute that the letter qualified as "third party correspondence." Outside of plaintiff's unsupported assertion that Countess and Brandon were motivated by plaintiff's protected conduct, plaintiff has offered no non-speculative evidence to support his claim that the disallowance of mail from Yvette Asahi was because plaintiff filed *Quiroz I,* participated in Sandoval's staff complaint, submitted a declaration in support of *Sandoval,* or filed an administrative grievance challenging a stopped mail six-months prior. *See Wood v. Yordy,* 753 F.3d 899, 904 (9th Cir.2014) ("mere speculation that defendants acted out of retaliation is not sufficient").

■ Moreover, it is clear that prisons have a legitimate penological interest in stopping prison gang activity. *See Bruce,* 351 F.3d at 1289. Prison security is a legitimate and neutral penological interest. *See Stefanow v. McFadden,* 103 F.3d 1466, 1472 (1996) (recognizing prison security as a legitimate and "compelling" penological interest and upholding content-based confiscation of book advocating racism and violence). Prison gangs in particular are a threat to inmate and staff safety, as well as to prison order. *See, e.g., Wilkinson v. Austin,* 545 U.S. 209, 227, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005). The court must "afford appropriate deference and flexibility" to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory. *See Pratt,* 65 F.3d at 807. Countess asserts that he stopped the incoming mail because it violated the rule against third party correspondence, and the mail came from a "drop box" address. Both rules are in place to prohibit prison gang activity.

Although the Ninth Circuit has held that "prison officials may not defeat a retaliation claim on summary judgment simply by articulating a general justification for a neutral process," *Bruce,* 351 F.3d at 1289, this is not a case like *Bruce* because here, there is an absence of evidence that defendants had a retaliatory motive. *See id.* (specifying that a general justification for a neutral process cannot defeat a retaliation claim when there is also a genuine issue of material fact as to retaliatory motive). Accordingly, defendants are entitled to summary judgment on this claim.

### B. *December 2008 incoming letter from Dawn Aguila*

On December 10, 2008, Countess and Brandon disallowed an incoming letter to plaintiff from Dawn Aguila. (Third Am. Compl. ¶ 60.) Plaintiff claims that Countess and Brandon conspired and retaliated against him for filing *Quiroz I,* participating in Sandoval's staff complaint, submitting a declaration in support of *Sandoval,*

and filing administrative grievances in January and July 2008. (*Id.* ¶¶ 45, 54, 56, 57, 60.) Plaintiff complains that the letter was stopped on the basis that the correspondence promoted gang activities. (*Id.* ¶ 60.) However, plaintiff asserts that Ms. Aguila is not a gang member, had no reason to promote gang activity, and that Countess and Brandon misinterpreted the contents of the letter. (*Id.*)

Countess averred that the letter from Ms. Aguila appeared to promote gang activities because it seemed to advise plaintiff about current gang activities by using street slang and coded terms, and appeared to seek direction from plaintiff. (Countess Decl. ¶ 17; Nimrod Decl., Ex. K.) Also, Countess believed the mail was "third party correspondence" because the letter was signed by a different person than the name on the envelope and the envelope was post-marked more than a month after the letter was written. (Countess Decl. ¶ 17; Nimrod Decl., Ex. K.) Plaintiff does not respond to defendants' arguments in his opposition and does not dispute that the mail satisfied the requirements to be labeled "third party correspondence."

Again here, there is no evidence of retaliatory motive. *See McCollum,* 647 F.3d at 882. First, plaintiff does not allege that Countess knew about plaintiff's protected conduct. With respect to Brandon, plaintiff asserts that in the spring of 2008, Brandon and other IGI officers were reading declarations that inmates had submitted in support of *Quiroz I.* (Third Am. Compl. ¶ 49.) However, it is not clear how this would demonstrate that Brandon would have a retaliatory motive. In another instance, plaintiff alleges that Brandon approved of the stopping of plaintiff's mail in June 2008. (*Id.* ¶ 45.) Plaintiff filed administrative grievances challenging the stopping of his mail, but there is no evidence that Brandon was aware of those

grievances. Plaintiff also cites to specific paragraphs in his third amended complaint in an effort to show that Countess and Brandon had notice of plaintiff's protected conduct. (*Id.* ¶ 60.) However, the paragraphs to which plaintiff refers include no factual support demonstrating that Countess or Brandon knew about plaintiff's protected conduct. (*Id.*)

In addition, even assuming that Countess and Brandon knew about plaintiff's protected conduct, as previously stated, there is no proximity in time between Countess and Brandon's disallowance of Ms. Aguila's incoming letter to plaintiff on December 10, 2008 and plaintiff's filing of *Quiroz I* in 2005, or plaintiff's participation in Sandoval's staff complaint in 2007. *See Vasquez,* 349 F.3d at 646. Further, neither Countess nor Brandon were defendants in *Quiroz I,* and the proximity in time between these events does not lead to an inference that Countess or Brandon was motivated by any of the protected conduct. Second, there is no evidence that Countess or Brandon expressed opposition to plaintiff's protected conduct. Third, plaintiff offers no evidence that Countess' reasons for concluding that the incoming mail was "third party correspondence" or that it promoted gang activities was false or pretextual. *See Wood,* 753 F.3d at 904–05 (speculation on defendant's motive is insufficient to defeat summary judgment). Though the timing between plaintiff's January and June 2008 administrative grievances with the December 10, 2008 stopping of Ms. Aguila's letter may support an inference of retaliation, *see Coszalter,* 320 F.3d at 977, by itself, timing is usually insufficient to support a finding of retaliatory motive, *see Pratt,* 65 F.3d at 808. Outside of plaintiff's unsupported assertion that Countess and Brandon were motivated by plaintiff's protected conduct, plaintiff has offered no other non-concluory evidence to support his claim that the disal-

lowance of mail from Ms. Aguila was "because of" plaintiff's protected conduct.

In addition, there is an absence of evidence that the stopping of this letter did not reasonably advance a legitimate penological goal. Again, it is clear that prisons have a legitimate penological interest in stopping prison gang activity. *Bruce,* 351 F.3d at 1289. The court must "afford appropriate deference and flexibility" to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory. *See Pratt,* 65 F.3d at 807. Countess asserts that he stopped the incoming mail because it violated the rule against third party correspondence and appeared to promote gang activities. Plaintiff does not dispute that the letter violated the rule against third party correspondence.

Accordingly, defendants are entitled to summary judgment on this claim.

### C. *October 2009 incoming mail from Lorie Quiroz*

On October 12, 2009, IGI Correctional Officer G. Pimentel and Brandon stopped incoming correspondence from plaintiff's niece, Lorie Quiroz, on the basis that it was gang-related. (Third Am. Compl. ¶ 70; Nimrod Decl., Ex. O.) The mail contained one letter and forty embossed envelopes. (Nimrod Decl. ¶ 21, Ex. O.) Plaintiff claims that Ms. Quiroz does not have an arrest record, nor does she engage in gang activities, and thus, plaintiff believed that the investigators misinterpreted the contents of her letter. (Third Am. Compl. ¶ 70.) At the second level of review, the response indicated that Ms. Quiroz's letter was investigated. (Nimrod Decl., Ex. O.) The response concluded that the letter contained a small amount of gang-related information, i.e., information about a gang affiliate. (*Id.*) However, in the interest of keeping gang-related information from gang affiliates, the specific contents of the letter were withheld from plaintiff. (*Id.*) After investigation, the letter was disallowed but plaintiff was given the forty embossed envelopes. (Nimrod Decl. ¶ 21.)

■ Defendants are entitled to summary judgment on this retaliation claim because there is an absence of evidence that Pimentel and Brandon's actions were "because of" plaintiff's protected conduct. Here, plaintiff argues that defendants stopped the incoming letter from Ms. Quiroz because they were retaliating against plaintiff for filing *Quiroz I,* participating in Sandoval's staff complaint, submitting a declaration in support of *Sandoval,* and filing seven administrative grievances from January 2, 2008 through October 12, 2009. (Third Am. Compl. ¶ 70.)

First, plaintiff does not provide evidence that Pimentel even knew about plaintiff's protected conduct. Similarly, in addition to the previous times plaintiff alleged that Brandon had "notice" (*Id.* ¶ 60), plaintiff refers to three more paragraphs within his third amended complaint in which he claims that Brandon had "notice" of plaintiff's filing of grievances. (*Id.* ¶¶ 60, 68, 69.) However, in two of those paragraphs, the evidence merely demonstrates that Brandon approved of the stopping of plaintiff's mail in December 2008 and October 2009. (*Id.* ¶¶ 60, 69.) That is, plaintiff filed administrative grievances challenging Brandon's stoppage of plaintiff's mail, but there is no evidence that Brandon was aware of those grievances. The remaining paragraph in which plaintiff alleges he gave notice to Brandon is conclusory, wholly unsupported, and fails to demonstrate how Brandon knew about plaintiff's protected conduct. (*Id.* ¶ 68.) Thus, there is an absence of evidence that defendants were motivated to stop Ms. Quiroz's letter "because of" plaintiff's protected conduct.

Moreover, there is no proximity in time between Pimental and Brandon's stoppage

of Ms. Quiroz's incoming mail to plaintiff on October 12, 2009 and plaintiff's filing of *Quiroz I* in 2005 or plaintiff's participation in Sandoval's staff complaint in 2007. *See McCollum*, 647 F.3d at 882. *Quiroz I* did not include either Pimentel or Brandon as defendants, and there is no other evidence from which to infer the filing of *Quiroz I* would have resulted in retaliation by Pimentel or Brandon.

Even assuming that Pimentel and Brandon knew about the administrative grievances, suspect timing, without more, is usually not enough to show retaliatory intent. *See Pratt*, 65 F.3d at 808. Here, nothing except suspect timing supports an inference of retaliatory intent. All of the administrative grievances were filed at least nine months prior to the challenged disallowance of mail from Ms. Quiroz, except for two: plaintiff's October 5, 2009 grievance and October 12, 2009 grievance. In the October 5, 2009 grievance, plaintiff was complaining about being moved because he was trying to help inmate Sandoval with *Sandoval.* (Third Am. Compl. ¶ 68.) There is no indication that defendants Pimentel or Brandon knew about this grievance or the cell move. In the October 12, 2009 grievance, plaintiff complained that incoming mail from Rob Ramirez was stopped as third party correspondence. (*Id.* ¶ 69.) Although defendants Pimentel and Brandon were the officials who decided to stop the mail for investigation, the evidence shows that plaintiff was ultimately given the letter after investigation. (*Id.*; Nimrod Decl., Ex. M.) Without more, the timing of these administrative grievances do not give rise to the reasonable inference that Pimentel or Brandon would be motivated to retaliate against plaintiff.

Moreover, there is no evidence that Pimentel or Brandon had expressed any opposition to plaintiff's protected conduct. In addition, it is not apparent why plaintiff's grievances or litigation efforts would have engendered retaliatory animus on the part of Pimentel or Brandon. *See Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir.2009) (recognizing that plaintiff must put forth evidence that his protected conduct was the substantial or motivating factor behind defendant's conduct). Finally, plaintiff has not shown that the reasons proferred by Pimentel or Brandon for stopping Ms. Quiroz's letter were false or pretextual. Through plaintiff's administrative grievances, plaintiff was told that Ms. Quiroz's letter contained information about a gang affiliate, which was not permitted. (Nimrod Decl., Ex. O.) The Ninth Circuit has instructed courts to "afford appropriate deference and flexibility" to prison officials when evaluating their proffered legitimate reasons for conduct alleged to be retaliatory. *Pratt*, 65 F.3d at 807. Plaintiff has not controverted defendants' evidence.

Accordingly, defendants are entitled to summary judgment on this claim.

### D. *January 2010 outgoing mail to Veronica Rodriguez*

On November 26, 2009, inmate Frank Fernandez's father died. Fernandez told plaintiff about the death, and plaintiff told Fernandez that he would send Fernandez's sister, Elaine Samaniego, $200 to buy flowers and help with funeral expenses. (Third Am. Compl. ¶ 71.) On January 3, 2010, plaintiff wrote to his friend, Veronica Rodriguez, to ask her to send $200 to Ms. Samaniego. (*Id.* ¶ 72.) On January 5, 2010, Pimentel and McGuyer stopped the letter because it violated the rule of "funds enclosed in correspondence." (*Id.* ¶ 73.) At the second level of review, plaintiff alleges that Sgt. Dornback improperly added new reasons for confiscating the letter. (*Id.*) After plaintiff complained that Dornback added new reasons for confiscating the letter, Dornback and Warden

Lewis filed an amended second level of review response. (*Id.*)

Plaintiff claims that Pimentel and McGuyer conspired and retaliated against him by confiscating plaintiff's outgoing letter to Ms. Rodriguez that asked her to send money to Ms. Samaniego. Plaintiff also alleges that Dornback furthered the retaliation by conducting a sham investigation. Plaintiff asserts that Pimentel, McGuyer, and Dornback retaliated against plaintiff for filing *Quiroz I*, participating in Sandoval's staff complaint, submitting a declaration in support of *Sandoval*, and filing eight administrative grievances from January 2, 2008 through October 26, 2009. (Third Am. Compl. ¶ 73.)

A review of the record shows that, at the second level of review, it was determined that Ms. Samaniego was identified as being the sister of inmate Frank Fernandez, who was a validated Mexican Mafia prison gang associate. (Nimrod Decl., Ex. Q.) The reviewer concluded that it was reasonable to find that plaintiff's request for the $200 was intended to be used "for or on behalf of Fernandez," who was an inmate, which violated the California Code of Regulations.[9] (*Id.*) Further, the reviewer concluded that the outgoing letter violated PBSP policies against circumventing CDCR policies and procedures, and third party correspondence. (*Id.*) At the director's level of review, the appeals examiner agreed with the second level of review response, and added that because plaintiff's letter to Ms. Rodriguez was sent on January 5, 2010, more than one month after the death of Frank Fernandez's father, it was reasonable to conclude that the money was not intended for flowers or funeral expenses, but rather as a means to transfer money from one inmate to another. (*Id.*)

■ Here, plaintiff's claim fails because of an absence of evidence of retaliatory motive. *See McCollum,* 647 F.3d at 882. There is no evidence that Pimentel knew about plaintiff's protected conduct. As for McGuyer and Dornback, plaintiff asserts that they had "notice" of "retaliation and misconduct," but the evidence does not lead to such an inference. (Third Am. Compl. ¶ 73, citing ¶¶ 45, 49, 54, 56, 57, 60, 66, 69, 70.) Moreover, in none of the paragraphs to which plaintiff cites in support of his assertion does plaintiff mention McGuyer or Dornback, much less provide evidence that McGuyer or Dornback had knowledge of plaintiff's protected conduct.

Further, as discussed previously, there is no proximity in time between defendants' alleged retaliatory conduct and plaintiff's filing of *Quiroz I* in 2005, plaintiff's participation in Sandoval's staff complaint in 2007, or plaintiff's 2009 declaration in support of *Sandoval.* Pimentel, McGuyer, and Dornback were not named as defendants in *Quiroz I* or in *Sandoval.* The administrative grievances closest in proximity in time were filed approximately three months prior to the challenged confiscation of mail. However, even assuming that a three month gap is sufficient to show suspect timing, without more, it is usually not enough to show retaliatory intent. *See Pratt,* 65 F.3d at 808. In other words, the proximity in time between these events does not lead to an inference that Pimentel, McGuyer, or Dornback was substantially motivated by any of the protected conduct. *See Huskey v. City of San*

---

9. "Funds may be mailed to an inmate in the form of a money order, certified check, personal check, or any other negotiable means except cash and travelers checks. Funds from other inmates/parolees shall be only ac-cepted from approved correspondents ... who are members of the same family, or the parent of the inmate's children." Cal. Code Regs., tit. 15, § 3140(a)(2) (2009).

*Jose,* 204 F.3d 893, 899 (9th Cir.2000) (retaliation claim cannot rest on the logical fallacy of *post hoc, ergo propter hoc,* i.e., "after this, therefore because of this"). Second, there is no evidence that Pimentel, McGuyer, or Dornback expressed opposition to the protected conduct. Third, plaintiff offers no specific evidence that the defendants' reasons for concluding that plaintiff's outgoing mail was an improper attempt to send inmate Frank Fernandez money was false or pretextual. *See Wood,* 753 F.3d at 904–05 (speculation on defendant's motive is insufficient to defeat summary judgment). Here, at the director's level of review, the finding that plaintiff violated prison policies was affirmed by non-defendants, who agreed that the confiscation of plaintiff's outgoing mail was proper. (Nimrod Decl., Ex. Q.) Outside of plaintiff's unsupported assertion that Pimentel, McGuyer, and Dornback were motivated to confiscate this letter because of plaintiff's protected conduct, plaintiff has offered no non-conclusory evidence to support his claim.

In addition, there is an absence of evidence that the stopping of this letter did not reasonably advance a legitimate penological goal. Defendants provided evidence that the letter was stopped because it was an attempt to provide funds for the benefit of another inmate, in violation of the California Code of Regulations. Again, prisons have a legitimate penological interest in stopping prison gang activity, *see Bruce,* 351 F.3d at 1289, and the courts must afford deference to their evaluation, *see Pratt,* 65 F.3d at 807 (finding that retaliation claims brought by prisoners must be evaluated in light of concerns over "excessive judicial involvement in day-to-day prison management, which 'often squander[s] judicial resources with little offsetting benefit to anyone.' ").

Accordingly, defendants are entitled to summary judgment on this claim.

### E. *November 2010 incoming letter from Yvette Almos*

On November 24, 2010, Pimentel stopped an incoming letter from Yvette Almos on the grounds that it discussed gang-related activity in a coded manner. (Third Am. Compl. ¶ 95.) Plaintiff filed an administrative grievance, and also wrote to Ms. Almos asking her if the correspondence that was stopped, in fact referred to other Mexican Mafia members or communicated gang-related activity from the Colton area in a coded manner. (*Id.* ¶¶ 98–99.) In response, Ms. Almos answered that her letter did not do those things. (Alvidrez Decl. ¶ 16.) In the administrative grievance, Sgt. Frisk and Lewis both affirmed that the letter contained coded messages related to gang activity. (Nimrod Decl., Ex. ee.) Plaintiff claims that Pimentel and Frisk retaliated against plaintiff for filing *Quiroz I,* participating in Sandoval's staff complaint, submitting a declaration in support of *Sandoval,* and filing 17 administrative grievances from January 2, 2008 through December 9, 2010. (Third Am. Compl. ¶ 99.)

Again, plaintiff's claim fails because of an absence of evidence of retaliatory motive. *See McCollum,* 647 F.3d at 882. Plaintiff does not allege that either Pimentel or Frisk had knowledge of plaintiff's previous grievances or lawsuit. Moreover, even assuming that proximity in time between the stopping of Ms. Almos' letter and any of plaintiff's grievances is circumstantial evidence of motive, it is not sufficient by itself to lead to an inference that Pimentel or Frisk was motivated by any of the protected conduct. *See Pratt,* 65 F.3d at 808. Second, there is no evidence that Pimentel or Frisk expressed opposition to the protected conduct. Third, plaintiff offers no evidence that the defendants' reasons for concluding that Ms. Almos' incoming mail included inap-

propriate coded messages were false or pretextual. *See Wood*, 753 F.3d at 904–05 (speculation on defendant's motive is insufficient to defeat summary judgment).

At the director's level of review, the findings were affirmed by non-defendants, who agreed that the confiscation of Ms. Almos' mail was proper. (Nimrod Decl., Ex. ee.) Although Ms. Almos declares that there was no reference to gangs or gang related messages in her letter, that she and plaintiff disagree with defendants' stated decision for stopping the letter does not necessarily demonstrate that the defendants' reasons were pretextual. *Cf. Koutnik v. Brown*, 456 F.3d 777, 785 (7th Cir.2006) (deferring to prison officials' assessment of what constitutes gang-related symbols and recognizing that courts owe substantial deference to prison administrators' professional judgment). Plaintiff's argument that the letter did not include gang related activity demonstrates that plaintiff disagreed with the accuracy of defendants' decision to stop the mail from reaching plaintiff. However, plaintiff's argument and Ms. Almos' opinion do not demonstrate that defendants' decision to stop Ms. Almos' letter was a pretext, or that it was a pretext substantially motivated by plaintiff's protected conduct. *See, e.g., Diorio v. County of Kern*, No. 11–cv–01569 LJO JLT, 2013 WL 1127687, at *10 (E.D.Cal. March 18, 2013) (stating that, in the employment context, evidence of pretense must be specific and substantial); *Keyser v. Sacramento City Unified School Dist.*, 265 F.3d 741, 753 n. 5 (9th Cir.2001) (differentiating between "specific," "substantial" evidence and opinions and beliefs that a defendant's actions were retaliatory, "based on no specific or substantial evidence"). Outside of plaintiff's unsupported assertion that Pimentel and Frisk were motivated to confiscate this letter because of plaintiff's protected conduct, plaintiff has offered no non-conclusory evidence to support his claim.

Finally, there is an absence of evidence that the stopping of this letter did not reasonably advance a legitimate penological goal. Defendants provided evidence that the letter was stopped because it contained coded messages. Again, it is clear that prisons have a legitimate penological interest in stopping prison gang activity. *Bruce*, 351 F.3d at 1289. Although plaintiff disputes the accuracy of defendants' actions, the court must "afford appropriate deference and flexibility" to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory. *See Pratt*, 65 F.3d at 807.

Accordingly, defendants are entitled to summary judgment on this claim.

### F. *Incoming mail from Burke, Williams & Sorensen*

On December 16, 2011, plaintiff was subject to a cell search. Frisk and ISU Captain Freeland stopped and confiscated incoming mail from Burke, Williams & Sorensen. (Third Am. Compl. ¶ 101.) As a result of the search, plaintiff discovered that documents produced to him by Short's defense counsel in discovery requests were confiscated. (*Id.* ¶¶ 102, 103, 108.) Plaintiff alleges that Frisk and Freeland conspired and retaliated against him by stopping and destroying plaintiff's legal discovery documents from Burke, Williams & Sorensen. When Frisk approached plaintiff to let plaintiff know that the documents had been confiscated, plaintiff told Frisk that the documents he destroyed were privileged legal mail that was sent to him by Short's lawyer. (*Id.* ¶ 102.) Frisk merely laughed and said, "I don't care, I know all about your conspiracy theory." (*Id.*) Plaintiff claims that Frisk and Freeland retaliated against plaintiff for filing *Quiroz I*, participating in Sandoval's staff complaint, submitting a declaration in support of *Sandoval*, filing 53 administrative grievances from October

2006 through December 2011, and filing the underlying federal action. (Third Am. Compl. ¶ 107; Opp. at 43.)

Sgt. Pieren interviewed plaintiff for purposes of plaintiff's administrative grievance. (Soderlund Decl., Ex. A.) Pieren also reviewed the stopped mail from Burke, Williams & Sorensen and found two confidential CDCR documents—he first was a "Post Order" or "Duty Statement" for Short, which included information such as the procedures for how and when IGI Sergeants respond to institution alarms. (Frisk Decl. ¶ 8.) Such information could be used by an inmate to disrupt the prison, which "would jeopardize the safety and security of the institution." (Id.; Soderlund Decl., Ex. A.) The second document was Short's work history which included personal information about Sgt. Short. (Id.) The reviewer concluded that, if an inmate were to possess those documents, it would pose a risk to the safety and security of the institution. (Id.) At the director's level of review, non-defendants reviewed the findings and denied plaintiff's appeal of his administrative grievance.

■■■ Plaintiff's claim fails because of an absence of evidence of retaliatory motive. See McCollum, 647 F.3d at 882. Even assuming that proximity in time between the stopping of the incoming letter from Burke, Williams & Sorensen and plaintiff's protected conduct is circumstantial evidence of motive, it is not sufficient by itself to lead to an inference that Frisk or Freeland was motivated by any of the protected conduct. See Pratt, 65 F.3d at 808. Second, there is no evidence that Frisk or Freeland expressed opposition to the protected conduct. Plaintiff asserts that when Frisk informed plaintiff that the discovery had been destroyed because they were confidential documents, plaintiff informed Frisk that the documents were evidence from Short's attorney in support of plaintiff's underlying complaint. (Third

Am. Comp. ¶ 102.) According to plaintiff, Frisk responded, "I don't care. I know all about your conspiracy theory," and laughed while Frisk left. (Id.) However, Frisk's statement was not an expression of opposition to plaintiff's filing of Quiroz I or administrative grievances. At most, Frisk acknowledged that he knew about plaintiff's filings, but awareness and opposition are not the same for these purposes. See McCollum, 647 F.3d at 882 (making a distinction between "awareness" and "opposition"). Third, plaintiff offers no evidence that the defendants' reasons for confiscating the incoming mail on the ground that the information was confidential to inmates were false or pretextual. See Wood, 753 F.3d at 904–05 (speculation on defendant's motive is insufficient to defeat summary judgment). At the director's level of review, the findings were affirmed by non-defendants, who agreed that the confiscation of the documents was proper. (Soderlund Decl., Ex. A.) In addition, courts in this circuit have concluded that Post–Orders such as the one confiscated by defendants are deemed confidential. See, e.g., Rogers v. Emerson, No. 12–1827 AWI, 2013 WL 6383239, at *3 (E.D.Cal. Dec. 4, 2013) (unpublished). Outside of plaintiff's unsupported assertion that Frisk and Freeland were motivated to confiscate these documents because of plaintiff's protected conduct, plaintiff has offered no non-conclusory evidence to support his claim.

Accordingly, defendants are entitled to summary judgment on this claim.

### G. April 2012 incoming mail from Vivian Chavez

On April 17, 2012, IGI Correctional Officer Healy and Freeland stopped an incoming letter from Vivian Chavez, on the basis that it contained coded messages and promoted gang activity. (Third Am. Compl. ¶ 109.) Plaintiff alleges that Pieren con-

spired to retaliate against him by conducting a sham investigation. (*Id.* ¶ 111.) Plaintiff refuted that the letter from Ms. Chavez included coded messages or promoted gang activity. (*Id.* ¶ 110.) Plaintiff claims that Healy, Freeland, and Pieren retaliated against plaintiff for filing *Quiroz I*, participating in Sandoval's staff complaint, submitting a declaration in support of *Sandoval*, filing 59 administrative grievances from October 2006 through April 2012, and litigating the underlying federal lawsuit. (Third Am. Compl. ¶ 112; Opp. at 37.)

■ First, there is an absence of evidence that Healy, Freeland, or Pieren knew about any of plaintiff's protected conduct. As such, they could not have been motivated by retaliation. Moreover, even though timing may properly be considered as circumstantial evidence of retaliatory intent, alone it is insufficient to support a retaliation claim. *Pratt,* 65 F.3d at 808; *see Stone v. Becerra,* No. 10–138 RMP, 2011 WL 1565299, *3 (E.D.Wash. April 25, 2011) (timing of cell search, without more, was insufficient to allege that search was retaliatory), *aff'd by* 520 Fed.Appx. 542 (9th Cir. May 22, 2013) (unpublished memorandum disposition). Moreover, there is no indication why Healy, Freeland, or Pieren would have any retaliatory animus for *Quiroz I* or the underlying federal action because Healy, Freeland, and Pieren were not defendants in *Quiroz I*, and they were not named as defendants in this action until after this challenged stopping of mail. In addition, plaintiff's participation in Sandoval's staff complaint and submission of a declaration in support of *Sandoval* appear to have little relevance to Healy, Freeland, or Pieren because they were not defendants in *Sandoval.*

Nonetheless, even assuming that the timing is suspect, there is no evidence that Healy, Freeland, or Pieren expressed opposition to plaintiff's protected conduct.

Furthermore, plaintiff offers no non-speculative evidence that the defendants' reasons for confiscating the incoming mail on the grounds that the letter was coded and contained gang-related material were false or pretextual. *See Wood,* 753 F.3d at 904–05 (speculation on defendant's motive is insufficient to defeat summary judgment). At the director's level of review, the findings were affirmed by non-defendants, who agreed that the confiscation of the mail was proper. (Soderlund Decl., Ex. C.) Outside of plaintiff's unsupported assertion that Healy, Freeland, and Pieren were motivated to confiscate this letter because of plaintiff's protected conduct, plaintiff has offered no non-conclusory evidence to support his claim. Moreover, as previously stated, defendants have provided evidence that the stop was intended to prevent gang-related activity, which serves a legitimate penological purpose.

Accordingly, defendants are entitled to summary judgment on this claim.

### 2. *Delay of mail*

Plaintiff sets forth three instances where defendants delayed plaintiff's incoming or outgoing mail after defendants stopped the mail for investigation. (Third Am. Compl. ¶¶ 69, 81, 84.) In each instance, defendants ultimately concluded that plaintiff's mail did not violate prison policies, and delivered the mail to the intended recipients. (*Id.* ¶¶ 69, 81, 84.)

First, on September 20, 2009, Pimentel and Brandon stopped incoming mail from Rob Ramirez because Pimental and Brandon determined that the incoming mail contained third party correspondence. (Third Am. Compl. ¶ 69; Nimrod Decl. ¶ 19.) Plaintiff complained that the letter was merely relaying a message from a friend or family member. (Third Am. Compl. ¶ 69.) On or around October 24, 2009, at the first level of review of plaintiff's administrative grievance, Pieren

agreed with plaintiff that the contents of the letter did not violate prison policies and delivered the letter to plaintiff. (*Id.*)

Second, on January 29, 2010, Pimentel and McGuyer stopped incoming mail from Elizabeth Casteneda because Pimentel and McGuyer believed the correspondence was an attempt to facilitate third party correspondence or pass messages. (Third Am. Compl. ¶ 81; Nimrod Decl. ¶ 26.) Plaintiff filed an administrative grievance. Pieren granted plaintiff's administrative grievance, concluding that "although the wording in the letter could be construed as trying to establish a third party communication, it in fact did not meet the definition...." (Nimrod Decl., Ex. T.) As a result, on March 10, 2010, plaintiff was given the letter. (*Id.*)

Third, on March 12, 2010, non-defendant IGI Correctional Officer Puente [10] and McGuyer stopped plaintiff's outgoing mail to Veronica Rodriguez on the ground that the mail was an attempt to circumvent regulations and violate the prohibition on contraband. (Third Am. Compl. ¶ 84; Nimrod Decl. ¶ 28.) Plaintiff filed an administrative grievance. Pieren granted plaintiff's administrative grievance, finding that the outgoing mail did not appear to violate the prison policies and mailed out plaintiff's correspondence the following day, on March 13, 2010. (Nimrod Decl., Ex. V.)

Defendants are entitled to summary judgment on these claims of retaliation because there is an absence of evidence as to causation and whether the delay chilled plaintiff's First Amendment right to file grievances and lawsuits.

▆ In determining whether a retaliatory motive exists, a relevant factor includes whether the defendant was aware of the prisoner's protected conduct. *Pratt,* 65 F.3d at 808. Here, plaintiff does not proffer facts to show that Pimentel knew about plaintiff's protected conduct or that the protected conduct motivated Pimentel to retaliate. (Third Am. Compl. ¶¶ 69, 81, 84.)

On the other hand, plaintiff asserts that he gave notice to Brandon about plaintiff's allegations of "retaliation and misconduct" and refers to seven paragraphs within plaintiff's third amended complaint in support of his assertion. (*Id.* ¶ 69, citing ¶¶ 45, 49, 54, 56, 57, 60, 68.) In one paragraph, plaintiff alleges that in January 2008, plaintiff told Brandon about *Quiroz I* and plaintiff's belief that IGI officers have been tampering with his mail in retaliation for the lawsuit. (*Id.* ¶ 45.) However, there is no evidence to demonstrate why Brandon would be motivated to retaliate against plaintiff for a lawsuit that did not name Brandon as a defendant. Plaintiff further asserts that in the spring of 2008, Brandon and other IGI officers were reading declarations that inmates had submitted in support of *Quiroz I.* (*Id.* ¶ 49.) Again, it is not clear how this would demonstrate that Brandon would have a retaliatory motive. In two other paragraphs, in an attempt to show motive, plaintiff alleges that Brandon approved of the stopping of plaintiff's mail in June and December 2008. (*Id.* ¶¶ 45, 60.) Plaintiff filed administrative grievances challenging the stopping of his mail, but there is no evidence that Brandon was aware of the grievances. The remaining paragraphs in which plaintiff alleges he gave notice to Brandon include no facts to support the assertion that Brandon knew about plaintiff's protected conduct. (*Id.* ¶¶ 56, 57, 68.) In addition, there are no facts alleging that McGuyer had notice of plaintiff's protected conduct. (*Id.* ¶¶ 45, 60.)

Regarding the stopping of plaintiff's outgoing mail to Ms. Rodriguez, plaintiff

---

**10.** Puente was voluntarily dismissed from this case by plaintiff.

claims that plaintiff gave McGuyer notice of plaintiff's protected conduct. (*Id.* ¶ 84, citing ¶¶ 69, 70, 73, 76, 80, 81, 83.) However, the court has reviewed the paragraphs to which plaintiff cites as support for his assertion that McGuyer had notice of plaintiff's protected conduct. None of those paragraphs demonstrate that McGuyer had knowledge of plaintiff's protected conduct. In addition, plaintiff does not allege facts to show that McGuyer knew about *Quiroz I.* In two of the cited paragraphs, plaintiff states that on January 5 and January 29, 2010, McGuyer approved Pimentel's decision to stop incoming mail to plaintiff, and outgoing mail from plaintiff. (*Id.* ¶¶ 73, 81.) However, even though plaintiff challenged these findings by filing administrative grievances, there is no evidence that McGuyer knew about those grievances. In another paragraph, plaintiff states that he challenged the loss of several drawings in an administrative grievance, and at director's level of review, plaintiff alleged that McGuyer was a supervisor who failed to remedy the problem. (*Id.* ¶ 80.) However, again, this is insufficient to infer that McGuyer knew about plaintiff's protected conduct, much less was substantially motivated by that conduct to retaliate.

██ In addition, although retaliatory motive may be shown by the timing of the allegedly retaliatory act and inconsistency with previous actions, *Bruce,* 351 F.3d at 1288–89, retaliatory motive is not established simply by showing adverse activity by the defendant after protected conduct; rather, the plaintiff must show a nexus between the two, *Huskey,* 204 F.3d at 899 (retaliation claim cannot rest on the logical fallacy of *post hoc, ergo propter hoc,* i.e., "after this, therefore because of this"). Here, plaintiff has not met his burden of showing that retaliation was the "substantial" or "motivating" factor behind Pimentel, McGuyer, or Brandon's actions. Plaintiff's bare factual assertions that the

stopping of his mail was motivated by such reason is no more than *post hoc, ergo propter hoc.* In other words, plaintiff asserts that because he filed grievances and litigated lawsuits, the stops must have been retaliatory based upon suspect timing. Yet, plaintiff has put forth no non-speculative evidence showing a triable issue of fact as to a causal nexus. For example, he offers no evidence of having personal knowledge, as opposed to offering speculation, of such a motive. Further, there is no evidence that any of these defendants expressed opposition to plaintiff's protected conduct. Nor is there evidence tending to show that Pimentel, McGuyer, or Brandon's reasons for stopping or approving of the stopped mail were false or pretextual.

██ In addition, plaintiff has not shown that these instances of stopped mail chilled the exercise of his First Amendment right to file grievances or lawsuits. A prisoner must at least allege that he suffered harm, since harm that is more than minimal will almost always have a chilling effect. *Rhodes,* 408 F.3d at 567–68 n. 11; *see Resnick v. Hayes,* 213 F.3d 443, 449 (9th Cir.2000) (holding that a retaliation claim is not actionable unless there is an allegation of harm). The prisoner need not demonstrate a total chilling of his First Amendment rights in order to establish a retaliation claim. *See Rhodes,* 408 F.3d at 568–69 (destruction of inmate's property and assaults on the inmate enough to chill inmate's First Amendment rights and state retaliation claim, even if inmate filed grievances and a lawsuit). "[T]he proper First Amendment inquiry asks whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Id.* at 568.

██ Here, although a court must accept as true all factual allegations contained in a complaint, a court need not

accept a plaintiff's legal conclusions as true. *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. Outside of reciting the element that defendants "chilled" plaintiff's First Amendment rights, plaintiff does not otherwise support this element with any facts. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Even so, an allegation of harm, rather than a "chilling effect," may be a sufficient basis for a claim of retaliation. *Rhodes,* 408 F.3d at 569–70. However, in the three challenged instances of delayed mail, there is an absence of evidence that plaintiff was harmed. In each instance, plaintiff promptly contested the stopping of the mail, and on appeal of plaintiff's administrative grievance, it was determined that plaintiff was correct. Thereafter, plaintiff's mail was delivered. In a constitutional tort, as in any other, a plaintiff must allege that the defendant's actions caused him some injury. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 285–87, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Here, despite plaintiff's mail being held for further investigation, it was ultimately found that the mail should be delivered because the mail did not violate prison policies. Plaintiff has not provided sufficient evidence that the delay of his mail had a chilling effect on plaintiff's First Amendment activities, or that plaintiff was otherwise harmed.

Because there is an absence of evidence regarding causation as well as a chilling effect, defendants are entitled to summary judgment on these claims.[11]

**11.** Defendants also argue that they are entitled to summary judgment on plaintiff's claim that an unknown defendant discarded two items of mail. (MSJ at 27–28.) However, plaintiff only names Short as the liable principle defendant regarding these claims. (Third

### 3. *Withholding of prisoner declarations*

On January 14, 2008, plaintiff requested, and was ultimately granted, approval to receive approximately 22 declarations from prisoners to use in support of *Quiroz I.* (Third Am. Compl. ¶ 47.) On April 17, 2008, after having not received three such declarations (from inmates Victor Acuna, Mike Lerma, and Kenneth Johnson), plaintiff filed an administrative grievance regarding the undelivered declarations. (*Id.* ¶ 49.) At the first level of review, plaintiff's grievance was granted with the response that the IGI's office possessed none of the documents. (*Id.* ¶ 50.) On June 3, 2008, plaintiff wrote to Wilber, informing Wilber that "there was serious problem with the mailroom" or the IGI's office because inmate Acuna told plaintiff that Acuna had sent plaintiff the declaration a month prior. (*Id.* ¶ 53.) Plaintiff told Wilber that the IGI's office and Horel were defendants in *Quiroz I,* and that plaintiff believed that the IGI's office and Horel were trying to prevent plaintiff from submitting the declarations. (*Id.*) Plaintiff further informed Wilber that Hernandez told plaintiff that Hernandez recently found a declaration in her desk from inmate Acuna which had been sent to the IGI's office a month prior. (*Id.*) Plaintiff later found out that the declaration from inmate Lerma had been confiscated by non-defendant Rice[12] and Brandon because Lerma had submitted his declaration with a declaration from inmate Raymond Cazares in support of *Quiroz I.* (*Id.*) The parties do not state whether plaintiff ultimately received any of the three declarations.

Am. Compl. ¶¶ 80, 83.) The court address these claims in a separate order on Short's motion for summary judgment.

**12.** Rice was voluntarily dismissed from this case by plaintiff.

Plaintiff claims that Wilber retaliated against plaintiff by screening out the administrative grievance, and Hernandez and Brandon retaliated against plaintiff by withholding the challenged declarations. (*Id.*) Plaintiff alleges that defendants did so because of plaintiff's protected conduct.

However, plaintiff has not provided any non-speculative evidence to infer that Hernandez or Brandon withheld the declarations sent by inmates Acuna, Lerma, or Johnson. Brandon has submitted a declaration that he was not aware of Lerma's declaration being stopped. (Brandon Decl. (Reply) ¶ 2.) In support of his statement, Brandon points to a copy of the stopped mail notification, which indicates that the declaration was stopped because it violated the rule against inmate-to-inmate one time correspondence. (Pl. Opp., Pl. Decl., Ex. B ("Lerma Decl."), Ex. A; Docket No. 294 at 23.) The inmate-to-inmate one time correspondence rule allows SHU inmates to communicate with each other on a one time basis for the limited purpose of communicating about a court case. (Countess Decl. (Reply) ¶ 3.) The stopped mail notification issued because the correspondence from Lerma contained an unapproved affidavit from another inmate. (*Id.*) The evidence demonstrates that the stopped mail notification is signed by non-defendants Rice and Captain Vanderhoofven, but not by Brandon. (Docket No. 294 at 23.) Brandon declared that although Brandon was the ISU Captain, the stopped mail was issued by Rice and Captain Vanderhoofven, who was Acting ISU Captain at that time. (Brandon Decl. (Reply) ¶ 2.) Plaintiff has not submitted any evidence contradicting this assertion.

With respect to Johnson's declaration, Brandon points to a request for interview form submitted by plaintiff inquiring about Johnson's declaration. (Docket No. 253–1 at 75.) On that form, non-defendant Correctional Counselor Barnts wrote that Johnson's affidavit was "being reviewed by IGI" and Barnts indicated that he would "get back to [plaintiff] ASAP." (*Id.*) However, there is an absence of evidence that either Brandon or Hernandez were the individuals who withheld Johnson's declaration.

With regard to inmate Acuna's declaration, plaintiff submitted an administrative grievance on April 17, 2008 claiming that Acuna's declaration was not given to plaintiff by IGI officers. (*Id.* ¶ 49.) However, plaintiff does not submit any admissible evidence such as personal knowledge as to when, if at all, Acuna actually sent his declaration to plaintiff. *See* Fed. R. Evid. 602. Further, plaintiff also states that Acuna told plaintiff that Acuna did not send his declaration until May—after plaintiff filed his initial administrative grievance. (*Id.* ¶ 53.) In addition, in the administrative grievance, plaintiff did not accuse any specific defendant of withholding the declaration. In plaintiff's opposition, plaintiff accuses Hernandez of purposefully withholding Acuna's declaration from plaintiff because she was retaliating against plaintiff for filing an administrative grievance regarding the missing declarations. (Opp. at 17.) However, there is no evidence to suggest that Hernandez was even aware of plaintiff's administrative grievance. Plaintiff alleges that in June 2008, Hernandez informed plaintiff that she had "just recently" found Acuna's declaration in her desk. Defendants dispute that Hernandez made such a statement, but the court accepts as true plaintiff's allegation for purposes of defendant's motion for summary judgment. Even assuming plaintiff's allegation is true, there is still an absence of evidence that Hernandez knew that plaintiff filed an April 17, 2008 administrative grievance complaining about the missing declarations and purposefully withheld Acuna's declaration from plaintiff.

■ In addition, plaintiff has not provided any evidence of retaliatory motive. Even assuming that the timing was suspect, neither Hernandez nor Brandon were named in *Quiroz I* as defendants. There is no plausible evidence to infer that Hernandez or Brandon had illegitimate reasons to withhold these declarations, much less to retaliate against plaintiff for a lawsuit that did not involve either of them. Further, there is no evidence that Hernandez or Brandon expressed opposition to plaintiff's protected conduct. Plaintiff does not submit specific evidence to infer that Hernandez's statement that she "found" Acuna's declaration or Brandon's statement as to why Lerma's declaration was stopped was false or pretextual. *See Anthoine v. North Central Counties Consortium,* 605 F.3d 740, 753 (9th Cir.2010) (where plaintiff relies on circumstantial evidence to show retaliation, that evidence must be specific to defeat the motion for summary judgment). With respect to Hernandez, plaintiff does not suggest that Hernandez knew about plaintiff's protected conduct. Plaintiff merely states that upon asking Hernandez, Hernandez told plaintiff she had "found" inmate Acuna's declaration in her desk. (*Id.* ¶ 53.) This evidence does not purport to provide a nexus for retaliatory motive, nor does it suggest that Hernandez knew about plaintiff's protected conduct or purposely withheld declarations for a retaliatory motive. Finally, documentary evidence shows that Brandon did not confiscate Lerma's declaration, as supported by the stopped mail form which was issued by non-defendants Rice and Vanderhoofven. Moreover, the decision to stop the mail containing Lerma's declaration was because the mail containing Lerma's declaration violated the rule against inmate-to-inmate one time correspondence. Plaintiff provides no contradictory evidence from which to infer that Brandon withheld Lerma's declaration

with any retaliatory intent, much less because of plaintiff's protected conduct.

In short, there is an absence of evidence that Hernandez or Brandon withheld the declarations or that they did so "because of" plaintiff's protected conduct.

Plaintiff claims that Wilber retaliated against plaintiff by improperly screening out plaintiff's appeal of his administrative grievance, and rejecting plaintiff's attempt to request that Wilber investigate plaintiff's claims. (Third Am. Compl. ¶ 53.) On May 17, 2008, plaintiff's administrative grievance regarding the missing declarations was granted at the informal level, when the response stated that the IGI office had none of plaintiff's legal documents. (Opp. at 910.) Plaintiff appealed the response on May 20, 2008 to Wilber, complaining that four months prior, plaintiff requested declarations from other inmates but had not yet received any. (*Id.*) Wilber screened out the appeal of the administrative grievance, and responded that plaintiff's requested action had previously been granted and no further action was required. (*Id.*) Plaintiff claims that Wilber screened out this appeal of the administrative grievance because plaintiff filed *Quiroz I,* and filed the underlying administrative grievance. (Third Am. Compl. ¶ 53.)

However, without more, suspect timing is insufficient to lead to a reasonable inference of retaliatory motive. There is no evidence that Wilber expressed opposition to plaintiff's administrative grievance or plaintiff's filing of *Quiroz I.* There is also no evidence that Wilber's decision to screen out the appeal of plaintiff's administrative grievance because plaintiff's informal level of appeal had already been granted was false or pretextual. (Opp. at 16; Wilber Decl. (Reply) ¶ 7.) In an attempt to demonstrate retaliatory motive, plaintiff argues that a month before Wilber screened out the appeal of plaintiff's

administrative grievance, Wilber had submitted a declaration in support of defendants in *Quiroz I.* (Opp. at 17.) Wilber concedes that he did so, however, Wilber explains that as the appeals coordinator at that time, Wilber was also the custodian of non-health care related administrative appeals of grievances by PBSP inmates. (Wilber Decl. (Reply) ¶ 2.) As part of his duties, he routinely prepared declarations describing the status of an inmate's administrative appeals in support of motions to dismiss inmate lawsuits. (*Id.* ¶¶ 4–5.) Moreover, Wilber asserts that his declaration in *Quiroz I* merely described the status of three of plaintiff's administrative appeals of plaintiff's grievances. There is no evidence that Wilber expressed any opinion regarding *Quiroz I* in his declaration, nor is there any other reason to suggest that Wilber's submission of a declaration in *Quiroz I* would lead to an inference of a retaliatory motive. Thus, plaintiff has not provided any specific or substantial evidence to support an inference that Wilber's reason for screening out plaintiff's appeal of the grievance regarding the declarations from Lerma, Johnson, and Acuna was false or pretextual. *See Anthoine,* 605 F.3d at 753.

Accordingly, defendants are entitled to summary judgment on this claim.

### 4. *RVR for requesting dictionary for Alfred*

Plaintiff claims that on February 12, 2010, Short issued an RVR against plaintiff in retaliation for plaintiff's protected conduct. The RVR charged plaintiff with promoting gang activity. It stated that on February 12, 2010, defendant learned that inmate Alfred Sosa, a validated Mexican Mafia member, received a Random House Webster's Unabridged Dictionary which had been purchased by Ms. Gallegos. (Nimrod Decl. ¶ 29, Ex. W at 15.) Short remembered that, on January 6, 2010, Short had reviewed a letter written by plaintiff to Ms. Gallegos, giving her the information needed to buy a Random House Unabridged Dictionary for "Alfred." (*Id.*) The RVR presumed that plaintiff's reference to "Alfred" referred to inmate Alfred Sosa, a Mexican Mafia gang member. Also, based on a 2005 prison confidential memorandum, Short knew that Ms. Gallegos was the secretary of Michael DeLia, Sosa's crime partner. According to the 2005 prison confidential memorandum, DeLia and Sosa assassinated DeLia's wife for allegedly talking to authorities about the Mexican Mafia gang. Based on that information, Short issued an RVR to plaintiff for promoting gang activity, in violation of California Code of Regulations, title 15 § 3023. D. Barneburg approved the issuance of the RVR. Senior Hearing Officer Coulter presided over the disciplinary hearing and found plaintiff guilty of promoting gang activity.

Defendants argue that they are entitled to summary judgment on this claim because there is an absence of evidence that D. Barneburg and Coulter knew about plaintiff's protected conduct, and further, that D. Barneburg and Coulter had legitimate reasons for charging and finding plaintiff guilty of promoting gang activity.

To support plaintiff's assertion that circumstantial evidence supports an inference of retaliatory motive, plaintiff asserts that D. Barneburg and Coulter knew that plaintiff had filed *Quiroz I,* participated in Sandoval's staff complaint, submitted a declaration in support of *Sandoval,* and submitted administrative grievances between October 2006 through February 2010. (Third Am. Compl. ¶ 85; Opp. at 27.) Here, there is an inference that D. Barneburg knew about some of plaintiff's conduct because D. Barneburg was listed as a defendant in *Sandoval,* and plaintiff participated in both Sandoval's staff complaint in 2007, which is related to *Sando-*

*val,* and submitted a declaration in *Sandoval.*

However, there is no evidence that Coulter knew about plaintiff's protected conduct. Plaintiff cites to 15 paragraphs within his third amended complaint in an attempt to demonstrate that Coulter had "notice" of defendants' retaliation and misconduct. (Third Am. Compl ¶ 85, citing ¶¶ 45, 49, 54, 56, 57, 60, 68, 69, 70, 73, 76, 80, 81, 83, and 84.) However, with the exception of one of those paragraphs, the other cited paragraphs do not even mention Coulter. As to the one paragraph that mentions Coulter, plaintiff merely alleges that on November 29, 2009, Coulter allowed inmate Frank Fernandez to make a phone call regarding the death of Fernandez's father. (*Id.* ¶ 73.) In sum, the paragraphs to which plaintiff cites do not provide evidence that Coulter knew about plaintiff's protected conduct. Without such evidence, plaintiff's claim against Coulter cannot survive summary judgment. *See Corales,* 567 F.3d at 568 ("a plaintiff creates a genuine issue of material fact on the question of retaliatory motive when he or she produces, *in addition to evidence that the defendant knew of the protected speech,* at least (1) evidence of proximity in time between the protected speech and the allegedly retaliatory decision, (2) evidence that the defendant expressed opposition to the speech or (3) evidence that the defendant's proffered reason for the adverse action was false or pretextual.") (italics in original) (internal quotation marks omitted).

As to D. Barneburg, in addition to knowledge of protected conduct, plaintiff must provide evidence that supports an inference of retaliatory motive. Based on the record, the court finds that a reasonable inference can be made that D. Barneburg's decision to approve the issuance of the RVR because it promoted gang activity is false or pretextual. The RVR stated that plaintiff asked Ms. Gallegos to purchase a particular dictionary for inmate Sosa, who is also a Mexican Mafia member. Based on such evidence, in addition to a 2005 prison confidential memorandum indicating that Ms. Gallegos was the secretary of Sosa's crime partner, Short issued, and D. Barneburg approved, an RVR for promoting gang activity in violation of California Code of Regulations, title 15 § 3023.[13]

However, the undisputed evidence shows that the substance of plaintiff's letter concerns the request to buy a new dictionary for someone named Alfred. (Docket No. 254, Ex. 31.) Defendants do not allege, nor is there evidence demonstrating, that the letter contained coded or gang-related messages. In fact, defendants does not assert how plaintiff's request to Ms. Gallegos to purchase a new dictionary for another inmate, who is also a gang member, promotes, furthers, or assists a gang in violation of Section 3023. In short, defendants do not attempt to explain how plaintiff's request to purchase a new dictionary for Alfred knowingly promoted gang activity or was a threat to prison security.

**13.** Section 3023 provides: "(a) Inmates and parolees shall not knowingly promote, further or assist any gang as defined in section 3000.(b) Gangs, as defined in section 3000, present a serious threat to the safety and security of California prisons." 15 Cal. Code Regs. § 3023 (2010). Section 3000 defines "gang" as, "Gang means any ongoing formal or informal organization, association or group of three or more persons which has a common name or identifying sign or symbol whose members and/or associates, individually or collectively, engage or have engaged, on behalf of that organization, association or group, in two or more acts which include, planning, organizing threatening, financing, soliciting, or committing unlawful acts or acts of misconduct classified as serious pursuant to section 3315." Cal. Code Regs., tit. 15, § 3000.

Moreover, an RVR is issued for a serious rules violation. The California Code of Regulations gives a non-exhaustive list of examples of serious rules violations to include such circumstances as: use of force or violence against another person, a breach of or hazard to facility security, a serious disruption of facility operations, manufacturing a controlled substance, and willfully inciting others to commit an act of force or violence. *See* Cal. Code Regs., tit. 15, § 3015. Here, there is an absence of evidence showing how plaintiff's letter requesting the buying of a new dictionary for another inmate reaches the level of a serious rule violation. Indeed, at the conclusion of the disciplinary hearing, Coulter admitted that "this offense is not explicitly listed [as a serious rule violation] under CCR 3315 as a serious offense" but then justified the guilty finding because promoting gang activity represents a serious threat to prison security. (Nimrod Decl., Ex. W.)

Here, the disconnect between the issuance of, and the stated reasons for, the RVR and the offending letter leads to a reasonable inference that those reasons are pretextual.

■ Defendants also argue that there was a legitimate penological goal for issuing the RVR, i.e., it is clear that prisons have a legitimate penological interest in stopping prison gang activity. *See Bruce,* 351 F.3d at 1289. However, the Ninth Circuit has cautioned that "prison officials may not defeat a retaliation claim on summary judgment simply by articulating a general justification for a neutral process, when there is a genuine issue of material fact as to whether the action was taken in retaliation for the exercise of a constitutional right." *Id.* Here, because there is a genuine issue of material fact as to retaliatory motive, defendants cannot rely on the prison's legitimate penological interest in prison security to succeed on their motion for summary judgment. Moreover, based on the absence of evidence supporting the issuance of the RVR for promoting gang activity, the court finds that there is also a genuine issue of material fact as to whether the issuance of the RVR reasonably advanced a legitimate penological goal.

■ Viewing the evidence in the light most favorable to plaintiff, based on the inference that the reason for issuing the RVR was pretextual, and the inference that the issuance of the RVR did not reasonably advance a legitimate penological goal, the court finds that there are genuine issues of material fact regarding whether D. Barneburg retaliated against plaintiff. However, because there is an absence of evidence that Coulter knew about protected conduct, there is necessarily an absence of evidence that Coulter harbored a retaliatory motive. Thus, summary judgment is granted on this retaliation claim as to Coulter.

■ Alternatively, defendants argues that D. Barneburg is entitled to qualified immunity. The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *See Pearson v. Callahan,* 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). "[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking

summary judgment," and must, as in other cases, view the evidence in the light most favorable to the non-movant. *Tolan v. Cotton*, —— U.S. ——, 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014) (per curiam).

Viewing the evidence in the light most favorable to plaintiff, D. Barneburg is not entitled to qualified immunity. Here, it would have been clear to D. Barneburg that approving the issuance of an RVR in retaliation for plaintiff's protected conduct would violate the law. Accordingly, D. Barneburg is not entitled to qualified immunity.

### 5. *Failure to notify plaintiff of trust seizure*

On July 8, 2010, Superior Court Judge Ransom issued a court order for seizure of approximately $91,000 from inmate accounts, including $276.63 from plaintiff's account. (Third Am. Compl. ¶¶ 90–91.) Plaintiff alleges that D. Barneburg, IGI Correctional Officer Milligan, and non-defendant IGI Supervisor Hawkes [14] conspired and retaliated against plaintiff by not informing him about the court's order and not giving him a receipt. (*Id.* ¶¶ 91, 94.) D. Barneburg typed receipts for the other 35 inmates, but not for plaintiff. Hawkes and Milligan further personally informed all other 35 inmates and gave them receipts informing them of the court order, but did not inform plaintiff or provide him with a receipt. On July 17, 2010, plaintiff tried to buy commissary, but was informed that plaintiff had no money in his account. (*Id.* ¶ 92; Opp. at 30.) Plaintiff filed an administrative grievance claiming an illegal seizure of funds. (Third Am. Compl. ¶ 93.) Plaintiff alleges that D. Barneburg and Milligan intentionally failed to inform plaintiff about the seizure of funds from plaintiff's account in retaliation against plaintiff's protected conduct.

First, plaintiff does not allege that Milligan was aware of plaintiff's protected conduct. Thus, there is no causal connection between Milligan's omission and plaintiff's protected conduct. Second, plaintiff states that D. Barneburg "had notice" of "retaliation and misconduct" and cites to paragraphs within his third amended complaint as support. (Third Am. Compl. ¶ 94, citing ¶¶ 45, 54, 56, 57, 60, 68, 69, 70, 73, 76, 80, 81, 83, 84, 85.) However, the court has reviewed the paragraphs to which plaintiff cites as support for his assertion that D. Barneburg had notice of plaintiff's protected conduct. In all but two of those paragraphs, D. Barneburg was not even mentioned. In one paragraph, however, plaintiff asserts that D. Barneburg knew that plaintiff filed a grievance because D. Barneburg was the second level reviewer in plaintiff's staff complaint against Short. (*Id.* ¶ 76.) However, in that grievance, D. Barneburg ultimately agreed with plaintiff and determined that in fact, Short violated CDCR policy. (*Id.*) Although D. Barneburg clearly knew in that instance that plaintiff had filed a grievance, it is not sufficiently clear how a reasonable inference can be made that D. Barneburg had some sort of retaliatory motive against plaintiff as a result. Plaintiff alleges that D. Barneburg also had notice of plaintiff's protected conduct with respect to the RVR that Sgt. Short issued against plaintiff regarding the purchase of a dictionary for inmate Sosa. (*Id.* ¶ 85.) However, that D. Barneburg approved the issuance of the RVR does not show that D. Barneburg then knew that plaintiff challenged the RVR in a subsequent administrative grievance.

Moreover, even assuming that the circumstantial evidence showed suspect timing, plaintiff would need more specific evidence to provide a reasonable inference

14. Hawkes was voluntarily dismissed from this case by plaintiff.

that plaintiff's protected conduct was a substantial or motivating factor for defendants' actions. Here, there is no evidence that D. Barneburg or Milligan had expressed opposition to plaintiff's protected conduct. Moreover, plaintiff does not provide any specific evidence to show that D. Barneburg's explanation that his failure to type a receipt for plaintiff was inadvertent was false or pretextual. *See Anthoine*, 605 F.3d at 753. In other words, plaintiff fails to provide a sufficient or plausible link of causation that defendants' actions or omissions were motivated by plaintiff's protected conduct. *See Wood*, 753 F.3d at 904.

Accordingly, defendants' motion for summary judgment is granted on this claim.

### 6. *Cell search*

On December 16, 2011, Frisk became aware of the incoming mail from Burke, Williams, & Sorenson and that the mail contained documents about Short's In–Service Training Records, Employee Positional history, and Post Order or Duty Statement. (Docket No. 138, Frisk Decl. ¶¶ 7–8.) As a result, incoming mail was stopped and the documents destroyed. Plaintiff was not permitted to possess these documents because the documents included information that could be used by inmates to disrupt the prison. (*Id.* ¶ 8.) Frisk declares that, upon learning of attempted prohibited documents, he became concerned that plaintiff might possess additional confidential information, so Frisk ordered IGI Correctional Officers Bassett, Healy, Gongora, and Pimentel to assist Frisk in searching plaintiff's cell. (*Id.* ¶ 11.) When Frisk, Bassett, Healy, Gongora, and Pimentel arrived, plaintiff told them he had a court deadline date, and Bassett replied "we know but we are here to search your cell." (Third Am. Compl.

¶ 102.) After the search, plaintiff discovered that all of his paperwork had been confiscated. (*Id.* ¶¶ 102, 103, 108; Frisk Decl. ¶¶ 15–18.) At that time, Frisk also informed plaintiff of the disallowed, and subsequently destroyed, mail from Burke, Williams, & Sorenson, the law firm who is representing Short in this underlying federal action. (Frisk Decl. ¶ 18.) As previously stated, the mail included two confidential CDCR documents. Specifically, the "Post Order" or "Duty Statement" for Short included information that could be used by an inmate to disrupt the prison, such as the procedures for how and when IGI Sergeants respond to institution alarms. Such information could be used by an inmate to disrupt the prison, which "would jeopardize the safety and security of the institution." The second document was Short's work history which included personal information about Short. After reviewing all of plaintiff's confiscated paperwork from the cell search, and finding no contraband except for excess books, magazines and trash, the remainder of plaintiff's property was returned on December 22, 2011, one day after plaintiff's court deadline. (Frisk Decl. ¶ 16; Third Am. Compl. ¶ 107.)

Plaintiff alleges that Frisk, Bassett, Healy, Gongora and Pimentel conspired and retaliated when they searched plaintiff's cell and confiscated all of plaintiff's legal paperwork. Plaintiff points out that defendants filed a motion to dismiss in the underlying action on November 21, 2011.[15] (Docket No. 105.) On December 9, 2011, plaintiff filed a motion to extend the deadline to file his opposition from December 21, 2011 to March 20, 2012. (Docket No. 115.) On December 16, 2011, after defendant Frisk learned about the incoming

---

**15.** This motion to dismiss was filed by the California Attorney General's office on behalf of all defendants except for Short, who did not join in the motion and is separately represented by Burke, Williams, & Sorenson.

mail from Burke, Williams, & Sorenson containing confidential documents, Frisk, Bassett, Healy, Gongora, and Pimentel searched plaintiff's cell and confiscated all of plaintiff's paperwork for submission to the IGI office for investigation. After the investigation, all of plaintiff's paperwork except for the prohibited excess books, magazines and trash was returned to plaintiff on December 22, 2011, one day after plaintiff's court deadline.

██ Viewing the evidence in the light most favorable to plaintiff, at the time Frisk ordered the cell search, he and the other defendants present for the search knew about plaintiff's lawsuit prior to the search as evidenced by Bassett's acknowledgment to plaintiff that "we know [about your court deadline] but we are here to search your cell." Moreover, the timing of the cell search is certainly suspect. In addition, according to plaintiff, defendants knew that plaintiff had an impending court deadline and purposely retained his paperwork until the day after the deadline had passed. Finally, plaintiff suggests that Frisk's stated reason for ordering the cell search, i.e., because Frisk was concerned that plaintiff might have more confidential documents in his cell, was false because in response to plaintiff's administrative grievance, the second level of review response indicated that plaintiff's cell search was "based on a current investigation on [plaintiff] and other EME members and associates." (Opp., Pl. Decl., Ex. G–1.)

There is no question that routine cell searches conducted for the purpose of preserving institutional order, discipline, and security further those legitimate penological goals. *See Hudson v. Palmer,* 468 U.S. 517, 529, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) ("Random searches of inmates, individually or collectively, and their cells and lockers are valid and necessary to ensure the security of the institution and the safety of inmates and all others within its

boundaries"). Frisk submitted evidence that based on the mail from Burke, Williams, & Sorenson which contained documents that plaintiff was not allowed to possess for the security of the institution, Frisk was concerned that plaintiff may have had additional prohibited documents in plaintiff's possession. However, based on the different reasons given by the second level of review and Frisk for the cell search and confiscation of paperwork, a reasonable inference can be made that the reasons are false or pretextual.

In addition, a reasonable inference can be made that the retention of plaintiff's paperwork until one day after plaintiff's court deadline was made for a retaliatory purpose. Viewing the evidence in the light most favorable to plaintiff, plaintiff alleges that on the day of plaintiff's court deadline, a prison librarian called the IGI unit and left a message that plaintiff needed his legal property returned. (Opp. at 41.) Although defendants argue that plaintiff was not harmed by missing the court deadline because on January 6, 2012, plaintiff received an extension of time to March 20, 2012, to file his opposition to defendants' motion to dismiss, plaintiff need only demonstrate that his First Amendment rights were chilled, though not necessarily silenced. *See Rhodes,* 408 F.3d at 568–69. Whether plaintiff was ultimately harmed is not the appropriate test. At the time that defendants held onto plaintiff's paperwork, neither plaintiff nor defendants knew whether the court would grant plaintiff's extension of his deadline. Finally, defendants do not set forth any evidence that "but for" any retaliatory motive, they still would have retained plaintiff's paperwork until December 22, 2011. *See Allen v. Scribner,* 812 F.2d 426, 436 (9th Cir.) (recognizing that motivation generally presents a jury question), *amended by* 828 F.2d 1445 (9th Cir. 1987).

The court finds that there is a genuine issue of material fact as to whether defendants harbored a retaliatory motive. Accordingly, defendants are not entitled to summary judgment on this claim.

For similar reasons, defendants are also not entitled to qualified immunity. It is clearly established that retaliating against a prisoner for his use of the prison grievance system and for litigating violates a prisoner's constitutional rights. *See Rhodes,* 408 F.3d at 567; *Pratt,* 65 F.3d at 806 (stating the "prohibition against retaliatory punishment is "clearly established law" in the Ninth Circuit, for qualified immunity purposes"). Viewing the evidence in the light most favorable to plaintiff, it would have been clear to a reasonable prison official that conducting a cell search, confiscating plaintiff's paperwork, and retaining plaintiff's paperwork until after plaintiff misses a court deadline in retaliation for plaintiff's protected conduct violated the law.

Accordingly, defendants are not entitled to qualified immunity.

### B. *Conspiracy*

■■■■ A civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage. *Gilbrook v. City of Westminster,* 177 F.3d 839, 856 (9th Cir.1999). To prove a civil conspiracy, the plaintiff must show that the conspiring parties reached a unity of purpose or common design and understanding, or a meeting of the minds in an unlawful agreement. *Id.* To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy. *Id.* A defendant's knowledge of and participation in a conspiracy may be inferred from cir-

cumstantial evidence and from evidence of the defendant's actions. *Id.* at 856–57.

■■■■ Conclusory allegations of conspiracy are not enough to support a § 1983 conspiracy claim. *Burns v. County of King,* 883 F.2d 819, 821 (9th Cir.1989) (per curiam). Although an "agreement or meeting of minds to violate [the plaintiff's] constitutional rights must be shown," *Woodrum v. Woodward County,* 866 F.2d 1121, 1126 (9th Cir.1989), "[d]irect evidence of improper motive or an agreement to violate a plaintiff's constitutional rights will only rarely be available. Instead, it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action." *Mendocino Environmental Center v. Mendocino County,* 192 F.3d 1283, 1302 (9th Cir.1999). Thus, "an agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants." *Id.* at 1301.

Fatal to most of plaintiff's conspiracy claims is that the court has found that there is no underlying constitutional violation for plaintiff's claims of retaliation, with the exception of the cell search and the RVR. As the Ninth Circuit has held, "[c]onspiracy is not itself a constitutional tort under § 1983," and it "does not enlarge the nature of the claims asserted by the plaintiff, as there must always be an underlying constitutional violation." *Lacey v. Maricopa Cnty.,* 693 F.3d 896, 935 (9th Cir.2012) (en banc). The court's finding that there is no constitutional violation for the retaliation claims, except for the cell search and the RVR, therefore necessarily means that there is no viable claim for conspiracy. *Id.; Avalos v. Baca,* 596 F.3d 583, 592 (9th Cir.2010) ("To support a claim of a conspiracy under § 1983, [p]laintiff's [c]omplaint must contain sufficient factual matter to show (1) the existence of an express or implied agreement among

the defendant officers to deprive him of his constitutional rights, and (2) an actual deprivation of those rights resulting from that agreement."). Therefore, plaintiff's conspiracy claims as to all the retaliation claims except for the cell search and the RVR fail as a matter of law, and defendants are entitled to summary judgment.

With respect to plaintiff's claims that Frisk, Bassett, Healy, Gongona and Pimentel conspired to retaliate against plaintiff by conducting the cell search, confiscating all of plaintiff's paperwork, and retaining that paperwork until after plaintiff's court deadline had passed, plaintiff concedes that he does not have firsthand knowledge of an agreement among the defendants. (Opp. at 46.) Nonetheless, plaintiff asserts that he has alleged sufficient evidence that defendants had a "meeting of the minds to deprive [plaintiff] of his rights by conspiring and demonstrating a collaborative mindset." (*Id.*)

The court agrees. "Whether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury, so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reached a[n] understanding to achieve the conspiracy's objectives." *Mendocino Environmental Center*, 192 F.3d at 1301–02 (internal quotation marks and citation omitted). Having concluded that there is a genuine issue of material fact regarding defendants' retaliatory motive in searching plaintiff's cell, confiscating his paperwork, and retaining that paperwork until after plaintiff's court deadline passed, there is at least a reasonable inference of an implicit agreement among Frisk, Bassett, Healy, Gongona, and Pimentel to retaliate against plaintiff.

Plaintiff also claims that Short, D. Barneburg, and Coulter conspired with each other to issue the RVR and find plaintiff guilty of promoting gang activity in retaliation for plaintiff's protected conduct. Viewing the evidence in the light most favorable to plaintiff, based on the inference that D. Barneburg harbored a retaliatory motive and the inference that the issuance of the RVR did not reasonably advance a legitimate penological goal, the court finds that there is a reasonable inference that Short, D. Barneburg, and Coulter reached an agreement to retaliate against plaintiff. Although there is an absence of evidence that Coulter knew about plaintiff's protected conduct and thus an absence of evidence that Coulter harbored a retaliatory motive, such a finding does not preclude the finding that there is a genuine issue of material dispute that Coulter was involved in a conspiracy to retaliate. *See Lacey*, 693 F.3d at 935 ("Conspiracy may, however, enlarge the pool of responsible defendants ...; the fact of the conspiracy may make a party liable for the unconstitutional actions of the party with whom he has conspired."); *Gilbrook*, 177 F.3d at 856–88 (recognizing that an allegation of conspiracy can be used to prove claims against defendants who need not know the exact details of the plan, but must share the common objective of the conspiracy and who are less directly involved in the underlying constitutional violation). Moreover, the evidence suggests that the acts of issuing the RVR and finding plaintiff guilty were "unlikely to have [occurred] without an agreement." *Mendocino Environmental Center*, 192 F.3d at 1302. Thus, the court finds that there is a possibility that the jury can infer from the circumstances that the alleged conspirators agreed to achieve the conspiracy's objectives.

Accordingly, defendants' motion for summary judgment on plaintiff's claim that Frisk, Bassett, Healy, Gongona, and Pimentel conspired to retaliate against him is DENIED. Defendants' motion for sum-

mary judgment on plaintiff's claim that D. Barneburg and Coulter conspired to retaliate against him is DENIED. Defendants' motion for summary judgment on plaintiff's remaining conspiracy claims is GRANTED.

### C. *Supervisory liability*

 A supervisor may be liable under section 1983 upon a showing of (1) personal involvement in the constitutional deprivation or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Henry A. v. Willden,* 678 F.3d 991, 1003–04 (9th Cir.2012). It is insufficient for a plaintiff only to allege that supervisors knew about the constitutional violation and that they generally created policies and procedures that led to the violation, without alleging "a specific policy" or "a specific event" instigated by them that led to the constitutional violations. *Hydrick v. Hunter,* 669 F.3d 937, 942 (9th Cir.2012). A plaintiff must also show that the supervisor had the requisite state of mind to establish liability, which turns on the requirement of the particular claim—and, more specifically, on the state of mind required by the particular claim—not on a generally applicable concept of supervisory liability. *Oregon State University Student Alliance v. Ray,* 699 F.3d 1053, 1071 (9th Cir.2012). Here, the requisite state of mind is one of deliberate indifference. *See id.* at 1074–75 & n. 18.

With respect to the retaliation claims upon which the court has granted summary judgment to defendants, the court has already determined that plaintiff has not demonstrated a genuine issue of material fact regarding defendants' personal involvement. Moreover, plaintiff does not set forth any evidence to support a theory of a causal connection between those defendants' specific conduct and the constitutional violations. In addition, plaintiff does not provide any non-conclusory evidence that those defendants created a specific policy or procedure that led to any retaliation, *see Hydrick,* 669 F.3d at 942, or that defendants acted with deliberate indifference.

In addition, there is an absence of evidence as to defendants' supervisory liability for the claims on which the court has granted summary judgment. Plaintiff has submitted several inmate declarations in support of his opposition to defendants' motion for summary judgment. (Docket Nos. 279, 280, 281, 282, 284.) In general, these inmate declarations unanimously opine that IGI officers harass inmates by interfering with inmates' incoming and outgoing mail. The declarations also intimate that IGI officers have an unofficial policy of intimidating inmates. However, the declarations do not name any supervisory defendants liable for creating or implementing this unofficial policy. *See Redman v. County of San Diego,* 942 F.2d 1435, 1446 (9th Cir.1991) (en banc). Nor do the declarations provide non-speculative evidence that the supervisory defendants named in this action knowingly acquiesced to such a policy. *See Oregon State University Student Alliance,* 699 F.3d at 1071.

In fact, plaintiff makes a blanket assertion that the supervisory defendants were the supervisors of specific individual defendants who allegedly violated plaintiff's constitutional rights. (Opp. at 50–51.) These allegations are conclusory and not supported by sufficient factual content that would allow them to meet the pleading standard articulated in *Iqbal. Compare Starr v. Baca,* 652 F.3d 1202, 1216–17 (9th Cir.2011) (reversing dismissal of claim against supervisor defendant sued in his official capacity for an attack against an inmate involving prison deputies, where plaintiff made "detailed factual allegations that go well beyond reciting the elements of a claim of deliberate indifference") *with*

*Hydrick v. Hunter,* 669 F.3d 937, 941–42 (9th Cir.2012) (dismissing Section 1983 claim against supervisors in their individual capacities where "instead of the detailed factual allegations in *Starr* ... plaintiffs' complaint is based on conclusory allegations and generalities, without any allegation of the specific wrong-doing by each defendant").

On the other hand, plaintiff has submitted sufficient evidence to defeat summary judgment as to Frisk, who was the supervising IGI officer of Pimentel, Bassett, Healy, and Gongora, regarding Frisk's supervisory liability as to plaintiff's claim that defendants retaliated against him by searching his cell, confiscating his paperwork, and retaining his paperwork until after plaintiff's court deadline had passed. Plaintiff has also submitted sufficient evidence to defeat summary judgment as to D. Barneburg, who was the supervising IGI officer of Short, regarding D. Barneburg's supervisory liability as to plaintiff's claim that defendants retaliated against plaintiff by issuing the RVR. Plaintiff has shown a genuine issue of material fact as to Frisk and D. Barneburg's personal involvement as well as a causal connection between their conduct and the constitutional violation. *Henry A. v. Willden,* 678 F.3d 991, 1003–04 (9th Cir.2012).

Accordingly, with the exception of Frisk and D. Barneburg, defendants are entitled to summary judgment with respect to plaintiff's allegation that they are liable as supervisors.

### D. *State law claims*

Plaintiff asserts a variety of state law violations. The court exercised supplemental jurisdiction over them. Before a state law claim can be brought, whether in state or federal court, the California Tort Claims Act ("CTCA") requires that the claim be presented to the Victim Compensation and Government Claims Board.

*See* Cal. Govt. Code §§ 911.2, 945.4; *Hernandez v. McClanahan,* 996 F.Supp. 975, 977 (N.D.Cal.1998) (recognizing that the failure to present timely California tort claims bars plaintiff from bringing them in federal suit).

Defendants first assert that plaintiff did not comply with the CTCA, Cal. Govt. Code § 945.6(a), because plaintiff failed to submit his federal civil rights complaint within six months of the denial of the state's rejection of plaintiff's claim. Here, plaintiff's state claims were rejected on June 17, 2010, and notice of the rejection was mailed to plaintiff on June 24, 2010. The parties agree that plaintiff's federal civil rights complaint was due to be mailed no later than December 24, 2010. Plaintiff declares that he mailed his federal civil rights complaint by turning it in to Officer Reich for mailing on December 23, 2010. Thus, the court finds that plaintiff has complied with the CTCA by filing his civil suit within six months of rejection of his claim, pursuant to Cal. Govt. Code § 945.6(a).

Defendants also assert that plaintiff has failed to comply with the CTCA because he failed to present them to the Claims Board more than six months after several of the causes of action accrued. *See* Cal. Govt. Code § 911.2. In plaintiff's tort claim form, submitted on May 9, 2010, plaintiff claims that the incidents at issue occurred from 2005 through April 25, 2010. Thus, argue defendants, any of plaintiff's claims that accrued before November 9, 2009 do not comply with Cal. Govt. Code § 911.2, and are thus untimely. Plaintiff does not address this argument. Based on a review of the record, the court finds that plaintiff's state law claims, which accrued before November 9, 2009, are untimely.

Finally, defendants argue that plaintiff's state law claims fail to state a claim because they do not state facts sufficient to

establish the elements of each cause of action. However, defendants rely on California's fact pleading standard, which requires more detail than the federal notice pleading standard. *See Bach v. County of Butte,* 147 Cal.App.3d 554, 561, 195 Cal. Rptr. 268 (1983) ("The rules of pleading in federal court are generally different from the rules of pleading in California state courts, since the Federal Rules of Civil Procedure recognize a form of "notice pleading," usually designed simply to put a defendant on notice of the nature of a claim, whereas California requires the pleading of facts."); *cf. Nagrampa v. Mail-Coups, Inc.,* 469 F.3d 1257, 1265 n. 2 (9th Cir.2006) (distinguishing between California's requirement that the claim "denote[s] the aggregate of operative facts which give rise to a right enforceable in the courts[ ]" and federal notice pleading standard pursuant to Rule 8(a)) (citation omitted). Indeed, plaintiff responds that the facts related to his state law claims are identical to those stated in his federal law claims and presented in his third amended complaint. As such, the court finds that defendants were fairly put on notice under the applicable liberal notice pleading standard set forth in Federal Rule of Civil Procedure 8(a). *See, e.g., Jones v. Tozzi,* No. 05–CV–0148 OWW DLB, 2006 WL 1582311, at *15 (E.D.Cal. June 2, 2006) (permitting a supplemental state law claim to satisfy the federal notice pleading standard); *Clement v. American Greetings Corp.,* 636 F.Supp. 1326, 1328 (S.D.Cal. 1986) ("The manner and details of pleading in the federal court are governed by the Federal Rules of Civil Procedure regardless of the substantive law to be applied in the particular action.").

Accordingly, defendants' motion for summary judgment as to plaintiff's state law claims that accrued before November 9, 2009, is granted because those claims are untimely. Defendants' motion for summary judgment as to plaintiff's remaining state law claims are denied.

V. *Referral to Settlement Proceedings*

In the court's order granting in part and denying in part defendant Short's motion for summary judgment, the court appointed counsel to represent plaintiff for the remainder of this case. The appointment shall include representation with respect to the remaining claims set forth above. In addition, the court finds good cause to refer this matter to Magistrate Judge Nathanael Cousins for settlement proceedings. The proceedings will consist of one or more conferences as determined by Judge Cousins. If these settlement proceedings do not resolve this matter, the court will then set this matter for trial.

**CONCLUSION**

1. Plaintiff's claims regarding events that occurred prior to 2007 are voluntarily dismissed. Those claims are dismissed without prejudice. Defendants' motion for summary judgment is DENIED in part and GRANTED in part. Summary judgment is DENIED as to plaintiff's claims of: (1) retaliation for searching plaintiff's cell, confiscating his paperwork, and retaining them until after plaintiff's court deadline had passed; (2) conspiracy to retaliate for the same; (3) retaliation for issuing and approving an RVR; (4) conspiracy to retaliate by approving an RVR and finding plaintiff guilty; and (5) plaintiff's state law claims accruing after November 9, 2009. Summary judgment is GRANTED as to the remaining claims.

2. The instant case is REFERRED to Judge Cousins for settlement proceedings on the remaining claims in this action, as described above, within **ninety (90) days** of the date counsel is located and appointed for plaintiff. Judge Cousins shall coordinate a time and date for a settlement

conference with all interested parties or their representatives.

3. The instant case is STAYED pending the result of the settlement conference proceedings. The clerk shall ADMINISTRATIVELY CLOSE this case file until further order of the court.

IT IS SO ORDERED.