Filed 1/18/22  P. v. Peoples CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B309819 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA046845) |
| v. | |
| HOWARD PEOPLES, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, William C. Ryan, Judge.  Affirmed.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, David W. Williams, Deputy Attorney General, for Plaintiff and Respondent.

_____

Following a suitability hearing under Proposition 36, the Three Strikes Reform Act of 2012 (Pen. Code, § 1170.126),[1] the superior court found that resentencing Howard Peoples would pose an unreasonable risk of danger to public safety, and it denied his petition for recall of sentence and resentencing. On appeal, Peoples contends he has ongoing mental health issues that have not been adequately treated in prison, preventing him from demonstrating his suitability for resentencing under Proposition 36. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *The Commitment Offense*

On August 8, 2000 a jury found Peoples guilty of corporal injury to a cohabitant (§ 273.5, subd. (a)) and misdemeanor damaging jail property (§ 4600, subd. (a)). In a bifurcated proceeding, the jury found true that Peoples had suffered convictions of three prior serious or violent offenses under the three strikes law (§§ 667, subds. (b)-(i), 1170.12) and had served two separate prison terms (§ 667.5, subd. (b)). The trial court[2] sentenced Peoples to 27 years to life in state prison, comprised of 25 years to life for the felony count as a third strike offense, plus two 1-year terms for his prison priors. The court imposed a concurrent term of six months in county jail on the misdemeanor count. In 2002 we affirmed Peoples's conviction and sentence in

---

[1]  All undesignated statutory references are to the Penal Code.

[2]  Judge Karl W. Jaeger presided over the trial. He retired prior to the filing of the petition.

2

*People v. Peoples* (Apr. 30, 2002, B144203) [nonpub. opn.] (*Peoples I*).

B.     *Peoples's Petition for Recall of Sentence and Resentencing*

On May 2, 2013 Peoples filed a petition for recall of sentence and resentencing under Proposition 36.  He argued his current and prior offenses were not serious or violent felonies within the meaning of the three strikes law, making him eligible for recall of his sentence.  (§ 1170.126, subd. (e)(3); see §§ 667, subd. (e)(2)(C)(iv), 1170.12, subd. (c)(2)(C)(iv).)  Peoples further argued he did not pose an unreasonable risk of danger to public safety, and therefore, he was qualified to be resentenced to a determinate second-strike term under Proposition 36. (§ 1170.126, subd. (f).)   On July 26, 2013 the superior court[3] issued an order to show cause why Peoples's sentence should not be recalled.

On November 13, 2013 the People filed an opposition to the petition, arguing "[t]here are issues regarding [Peoples's] suitability for resentencing due to the nature of his prior criminal history, his current crimes, and his extremely negative conduct while currently serving his prison commitment."[4]  The People described Peoples's conviction offense, prior strike offenses, two arrests while in custody, and multiple parole violations.  Further, Peoples's California Department of Corrections and Rehabilitation (CDCR) file contained at least 24 serious rules

---

[3]     Judge William C. Ryan.

[4]     The People acknowledged that Peoples was eligible for resentencing under Proposition 36.

violation reports (RVR's)[5] between 2001 and 2011. When Peoples was committed for his current offense, he was assigned a classification score[6] of 156, which rose to 261 as of February 2013.

After multiple continuances, on July 19, 2016 Peoples filed a reply brief arguing his conduct in prison had been "somewhat negative but not extreme" and noting Peoples at the time was 58 years old. Peoples's attorney stated his intent to request the superior court appoint an expert on Peoples's conduct while in

[5] "[A]n RVR is issued for a serious rules violation. The California Code of Regulations gives a non-exhaustive list of examples of serious rules violations to include such circumstances as: use of force or violence against another person, a breach of or hazard to facility security, a serious disruption of facility operations, manufacturing a controlled substance, and willfully inciting others to commit an act of force or violence." (*Quiroz v. Horel* (N.D.Cal. 2015) 85 F.Supp.3d 1115, 1143; see Cal. Code Regs., tit. 15, §§ 3312, subd. (a)(3) ["Disciplinary Methods"], 3315, subd. (a) ["Serious Rule Violations"].)

[6] "Under the applicable regulations, 'All persons entering the [CDCR] penal system are given a classification score which determines an inmate's security level. . . . The score is arrived at by tabulating points that are based on an array of objective factors which include, among other things, length of sentence, nature of the crime committed, criminal history, employment history, military service, marital status, age, prior escape attempts, and prior incarceration behavior.'" (*In re Morales* (2013) 212 Cal.App.4th 1410, 1413.) "'A higher score means the inmate is considered a higher security risk and would be assigned to a correspondingly higher security facility; a lower score means the inmate is considered a lower security risk and would be assigned to a correspondingly lower security facility.'" (*In re Nguyen* (2011) 195 Cal.App.4th 1020, 1024, fn. 1; see Cal. Code Regs., tit. 15, § 3375 et seq.)

prison and a second expert to evaluate Peoples in light of his "long psychological history."

On January 15, 2020[7] the superior court appointed Robert L. Ayers, Jr., a former warden at three state prisons and career correctional officer, as an expert for Peoples. Ayers submitted a report dated June 13, 2020 addressing Peoples's "in-prison behavior" and providing an expert opinion on Peoples's "impact on public safety should he be released from prison." Ayers concluded in his report, "While I can't say that if released from prison Howard Peoples would definite[l]y pose a risk to public safety, I can't say he wouldn't." Peoples filed a second reply in support of his petition on June 15, 2020, arguing that in light of Ayers's opinion, "there is insufficient evidence to show that [Peoples] is among those inmates who must be denied . . . relief" under Proposition 36.

On September 15, 2020 Ayers submitted an addendum to his report in which he revised his opinion after reviewing Peoples's corrections records for the period January 2018 to April 2020. Ayers opined, "It is my opinion based on the aforementioned new information that Mr. Peoples would pose an unreasonable risk to public safety if he were released from prison."

---

[7] Proceedings on Peoples's petition were further delayed for several years because Peoples refused to cooperate with his counsel, to be interviewed by an expert, and to appear at a hearing on his petition. In December 2018 new counsel was appointed to represent Peoples.

C.    *Evidence at the Suitability Hearing*

At the September 29, 2020 suitability hearing, the superior court admitted the parties' pleadings and exhibits into evidence.[8] The People argued Peoples posed "an unusual risk to the public safety" in light of his failure to cooperate during the petition process, his 10 RVR's in 2019 and two in early 2020, and his classification score of 273.  Peoples submitted on the papers.

1.    *Peoples's criminal history*

In 1973 and 1974 the juvenile court sustained allegations Peoples committed petty theft and robbery, respectively.  As an adult, Peoples was convicted in 1976 of carrying a loaded firearm in public; in 1977 of grand theft; also in 1977 of second degree burglary and carrying a concealed weapon; in 1978 of loitering; and in 1980 of carrying a switchblade.  Peoples was arrested for rape in 1978 and rape and attempted rape in 1979, but the charges were dismissed due to insufficient evidence.

In 1980 Peoples was convicted of first degree residential burglary with use of a firearm; robbery; and felon in possession of a firearm, and he was sentenced to nine years eight months in state prison.  Peoples was paroled in 1988, but he violated parole and was sentenced to an additional year in prison.  Peoples was paroled again in 1990.  Less than a year later, Peoples was convicted of armed robbery and was sentenced to 16 years in state prison.  Peoples was paroled on August 3, 1999.

The commitment offense occurred approximately five months after Peoples was released on parole.  As we described in

---

[8]    The People filed 73 exhibits, including Peoples's criminal court file, and his corrections records that contained 41 RVR's issued from January 2001 through April 2020.

*Peoples I, supra,* B144203, on December 19, 1999 Peoples got into an argument with the woman with whom he lived, Gwendolyn Clayburn. When Clayburn asked Peoples to move out of her apartment, Peoples punched and choked her. At the time of the offense, Peoples was a user of crack cocaine; a medical expert at trial testified that addicts can suffer hallucinations and paranoia resulting in aggressive and violent behavior.[9] While in custody following his arrest, Peoples damaged two jail mattresses by soaking them in the shower.

### 2. *Conduct while incarcerated*

Between January 2001 and April 2020, Peoples received 41 RVR's. The most serious violation occurred in 2006 when Peoples was found guilty of battery on peace officers resulting in serious injuries. Peoples struck two correctional officers attempting to conduct a search of his cell after Peoples had jammed his cell door. Peoples punched one of the officers in the face, knocking him to the ground and causing an injury that required six stitches. Other serious violations involving violence included attacking another inmate in 2001; threatening to assault a correctional officer also in 2001; physically resisting a correctional officer in 2005; threatening to assault a correctional officer in 2007; and getting into a fist fight with another inmate in 2019. Peoples was also found guilty of possession of contraband or "[w]eapon [s]tock," including a razor blade in 2001, a four-inch metal bolt partially crafted into a weapon in 2005,

---

[9]    In *Peoples I, supra,* B144203, we observed that at trial the trial court confined Peoples to a "'stealth chair'" because he was "assaultive and engaged in loud and abusive verbal outbursts in the courtroom."

7

and a cell phone in 2016. Peoples received approximately 24 RVR's for failure to obey orders, failure to respond to notices, and delaying correctional officers in their duties. In 2019 and early 2020, Peoples twice refused to move cells, refused on at least four occasions to report for medical checkups, and refused on at least five occasions to leave his cell to attend class assignments. Peoples also received RVR's for covering his cell door window (in 2001, 2005, 2007, and 2018), breaking his cell door window (2009), and blocking his food port (2011).

At the time of the suitability hearing in 2020, Peoples's risk classification score had risen to 273. Ayers opined that a classification score of 245 (Peoples's score in 2014) was "a very high score which reflects [Peoples's] negative in-prison behavior and program activity."

### 3.    *Mental health services*

Although Peoples did not argue in the superior court that he should be found suitable for resentencing based on a chronic mental illness, the record contains evidence of mental health issues through 2009. In 2001 prison psychiatrist L. Thomas wrote, "Peoples appears to have lengthy psych [history]," with periods of noncompliance with mental health medications and staff. Peoples was assigned follow-up case management, and RVR's issued to Peoples between 2001 and 2007 consistently noted that Peoples was a participant in the Mental Health Services Delivery System (MHSDS) through the Correctional Clinical Case Management System.

However, an RVR issued to Peoples in 2009 for breaking his cell door window stated he was not then a participant in the MHSDS program, although the reporting officer initiated a call to mental health services to extract Peoples from his cell. An RVR

8

issued in 2011 for disobeying orders (after Peoples held his food port open while demanding to speak to a senior officer) likewise noted Peoples was not a participant in MHSDS and "did not demonstrate unusual, uncharacteristic or bizarre behavior" that required a mental health assessment. An incident report related to the same violation categorized Peoples as "Mental Health: Clear." More recently, Peoples's 2017 classification report noted he was "not a participant in MHSDS," and his classification reports for 2017 and 2018 both state, "No MHSDS . . . issues noted." (Capitalization partially omitted.)

### 4. *Expert testimony*

Ayers stated in his June 13, 2020 report based on Peoples's in-prison record,[10] "There are multiple references in prison documentation that Peoples has a 'lengthy psych history.'" Further, Peoples had been assigned to the mental health program at the Correctional Clinical Case Management System level of care, but he refused to participate in the program therapy or take prescribed medication. Ayers opined, "Peoples'[s] behavior in the community has reflected violent tendencies. He does not appear to have any work skills, nor does he have an apparent way to support himself in the community. So[] the question of how he would live is unanswered. Also unanswered is the question of where he would live. He doesn't appear to have family on which he could rely. There does not appear any effort by Peoples during his incarceration to address these questions. [¶] Ordinarily I would be inclined to say a 62-year-old long term programming inmate would pose little threat to public safety. I can't really say that in this case. Peoples has refused educational

---

[10]     Peoples refused to meet with Ayers.

9

programming. He has not learned any work skills. He has not participated in any self-help programming. He has refused to participate in mental health programming. . . . [¶] While I can't say that if released from prison [Peoples] would definite[l]y pose a risk to public safety, I can't say he wouldn't."

In his addendum report, Ayers noted Peoples received 17 additional RVR's for the period from January 2018 to April 2020, including one for being involved in a fight, and Peoples had been confined to administrative segregation in April 2020 for unspecified safety concerns. Ayers opined, "I find this behavior troubling in a 62-year-old inmate who has done as much prison time as Mr. Peoples. [¶] . . . In my experience older inmates are involved in violence as a result of their own behavior—either by participating in illegal activities or by exhibiting behavior unacceptable to other inmates." Peoples's numerous refusals to cooperate with orders and notices also concerned Ayers "because if [Peoples] will not conform to simple behavior expectations in a structured prison environment, I believe his behavior in the outside community would be even worse." Ayers concluded, "It is my opinion based on the aforementioned new information that [Peoples] would pose an unreasonable risk to public safety if he were released from prison. I base this opinion on my belief that he would be unable to find employment and has no viable means of support or housing. . . . And, as he would likely be homeless and unemployed, I don't see any way he could survive in a community without resorting to some type of criminal behavior."

D.     *The Superior Court Order Denying Resentencing*

On November 30, 2020 the superior court issued a 14-page memorandum of decision and order denying Peoples's petition. The court described in detail the evidence adduced at the hearing

10

and considered the suitability factors set forth in section 1170.126, subdivision (g).[11]  The court found Peoples's criminal history included "multiple violent offenses, including convictions for robbery, weapons violations, burglary with a firearm, and an arrest for rape."  Further, Peoples's "behavior during the commitment offense reflects a tendency to resort to violence," and "the majority of these convictions occurred while [Peoples] was on supervised release."

Turning to Peoples's disciplinary record in prison, the superior court found "multiple instances of violence or threats of violence, including battery on an inmate without serious injury, threatening to batter a peace officer, possession of dangerous contraband, weapon stock/dangerous property, battery on a peace officer with serious injury, and fighting.  Aside from these acts of violence, [Peoples's] disciplinary history largely reflects a pattern of disregard of orders and refusal to follow the rules in prison. . . .  Furthermore, [Peoples's] high classification score is indicative of his violent rule violations and insubordinate attitude.  Finally, [Peoples] has continued to receive rule violations while seeking resentencing."

---

[11]    Section 1170.126, subdivision (g), provides, "In exercising its discretion in subdivision (f), the court may consider: [¶] (1) The petitioner's criminal conviction history, including the type of crimes committed, the extent of injury to victims, the length of prior prison commitments, and the remoteness of the crimes; [¶] (2) The petitioner's disciplinary record and record of rehabilitation while incarcerated; and [¶] (3) Any other evidence the court, within its discretion, determines to be relevant in deciding whether a new sentence would result in an unreasonable risk of danger to public safety."

The superior court also considered that Peoples presented no release plans and did not appear to have family or community resources on which he could rely. The court acknowledged that studies have found criminality generally decreases dramatically after age 50, but it found in light of Ayers's report that this did not appear to apply to Peoples, and the fact Peoples had been involved in a violent altercation as recently as 2019 indicated his violent tendencies had not declined as studies would suggest. The court concluded, in finding Peoples posed a current risk of danger to public safety if released: "Certainly, [Peoples's] criminal record is a concern. However, his criminal history is remote in time and cannot support a finding of current dangerousness without recent evidence establishing a rational nexus to that question. His disciplinary history involves multiple acts of violence and an apparent inability to follow the rules in prison, which raises questions about whether [Peoples] will carry those violent tendencies with him upon his release and whether he will be able to comply with the terms of his parole. Furthermore, [Peoples] has not taken advantage of any in-prison rehabilitative services and has refused to upgrade educationally or address his mental health. Finally, Ayers'[s] report is unsupportive of his release."

Peoples timely appealed.

12

# DISCUSSION

A.   *Governing Law and Standard of Review*

Proposition 36, approved by the electorate in November 2012, amended the three strikes law "to provide that absent specified exceptions, an offender with two or more prior strikes is to be sentenced as a two-strike offender unless the new offense also is a strike, that is, a serious or violent felony." (*People v. Piper* (2018) 25 Cal.App.5th 1007, 1013; accord, *People v. Yearwood* (2013) 213 Cal.App.4th 161, 167-168.) Proposition 36 also added section 1170.126, which created "a postconviction resentencing proceeding for specified inmates sentenced under the prior version of the [t]hree [s]trikes law." (*Piper*, at p. 1013; accord, *Yearwood*, at p. 168.) "Under that statute, a defendant sentenced as a three-strike offender may petition for recall of the sentence and for resentencing, subject to certain eligibility criteria." (*Piper*, at p. 1013; see § 1170.126, subd. (e).) "[Proposition 36's] resentencing mechanism has three separate aspects: (1) the initial petition for recall of the sentence, (2) a determination of eligibility, and (3) the court's discretionary decision whether the defendant poses an unreasonable risk of danger to public safety." (*People v. Frierson* (2017) 4 Cal.5th 225, 234; accord, *Piper*, at p. 1013.)

If a petitioner is eligible for resentencing under Proposition 36, the superior court may nonetheless deny the petition if the court "in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety." (§ 1170.126, subd. (f).) In exercising its discretion, the court may consider: (1) the petitioner's criminal conviction history; (2) the petitioner's "disciplinary record and record of rehabilitation while incarcerated"; and (3) any other

13

evidence the court, in its discretion, determines to be relevant. (§ 1170.126, subd. (g).) The court must consider "'"whether [a petitioner's prior criminal and/or disciplinary history], when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years [later]."'" (*People v. Buford* (2016) 4 Cal.App.5th 886, 914 (*Buford*).) "'"[T]he facts upon which the court's finding of unreasonable risk is based must be proven by the People by a preponderance of the evidence."'" (*People v. Piper, supra,* 25 Cal.App.5th 1007, 1016.)

"Under the clear language of section 1170.126, the ultimate determination that resentencing would pose an unreasonable risk of danger is a discretionary one. We, therefore, review that determination for abuse of discretion." (*Buford, supra,* 4 Cal.App.5th at p. 895; see *ibid.* ["'Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion "must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice."'"].)

B.    *The Superior Court Did Not Abuse Its Discretion in Denying the Petition*

Peoples's criminal history, disciplinary record in prison, and lack of postrelease plans all supported the superior court's determination that Peoples, if released, would pose an unreasonable risk of danger to public safety. There was no abuse of discretion.

Peoples's criminal record is extensive, beginning in 1973 when he was 16 years old, and continuing through his final offense in 1999, with few periods of time out of custody. He

14

committed numerous violent and dangerous offenses, including two burglaries involving firearms, robbery and armed robbery, two weapons-related offenses, and his penultimate commitment offense of corporal injury to his girlfriend. Peoples violated parole on multiple occasions, and his 1990 and 1999 offenses both occurred within a year of his release from prison while on parole.

Peoples's disciplinary record during his current commitment shows a continuing pattern of rule-breaking and violent behavior. Peoples received 41 RVR's during his commitment, 16 of which occurred between January 2018 and April 2020. Although his most violent offenses—including the 2006 battery of correctional officers—are remote in time—Peoples was disciplined for fighting another inmate as recently as 2019. As Ayers opined, Peoples's persistent refusal to obey orders, respond to notices, or participate in prison programming indicates that Peoples, despite his age and decades of commitment, is unlikely to conform to behavioral expectations necessary to maintain a job and function safely in the community. Peoples's risk classification score, which was already "a very high score" at the time of his petition, had increased to 273 by the time of the hearing on the petition.

The superior court also properly considered Peoples's lack of postrelease plans and resources. Ayers concluded Peoples did not have any work skills or family support, and he did not have plans for where he would live or how he would support himself if released. Further, Peoples refused educational, self-help, and mental health programming in prison. As discussed, Peoples's own expert (Ayers) opined in his revised opinion that Peoples would pose an unreasonable risk to public safety if he were released from prison. Peoples did not present any contrary evidence.

15

Peoples contends the superior court abused its discretion in failing to consider his mental health issues that went untreated in prison and resulted in the RVR's, and the court "precluded him from proving his parole suitability by failing to consider the impact of his mental illness on his ability to achieve the traditional suitability factors." This contention is both factually unsupported and legally untenable.

As a threshold matter, Peoples forfeited this contention by not raising it in the superior court. Even if he did not forfeit the argument, Peoples does not cite any evidence of how his mental health issues rendered him unable to show his suitability for release. It is true Peoples's criminal and court records reflect disturbing outbursts, including at his 2000 trial of the commitment offense, and it is undisputed that Peoples received mental health services in prison through 2007. But according to his prison records, starting in 2009 Peoples did not participate in the MHSDS program, and he "did not demonstrate unusual, uncharacteristic or bizarre behavior" that required a mental health assessment. Peoples's most recent classification reports (in 2017 and 2018) stated, "No MHSDS . . . issues noted." (Capitalization partially omitted.) Peoples argues on appeal that the very nature of his rule violations, such as his use of abusive and ranting language with correctional officers; his repeated tampering with his cell windows, door, and meals; his refusal of any prison programming, including medical services; and other manifestations of irrational recalcitrance demonstrates he suffers from mental health issues. Perhaps, but even if he had mental health issues, he failed to show they prevented him from availing himself of mental health and self-help services that could have addressed his behavior during the seven years his resentencing petition was pending.

16

Most significantly, Peoples has not cited any legal authority for the proposition that the suitability analysis of section 1170.126, subdivisions (f) and (g), does not apply where a petitioner suffers from mental health issues. The proper focus in a suitability hearing is on whether the petitioner currently poses an unreasonable risk of danger to public safety. (§ 1170.126, subd. (f); *Buford, supra*, 4 Cal.App.5th at p. 913.) Even if Peoples is correct that his mental health issues were the cause of his dangerousness to public safety, he failed to show while in custody that he could control his behavior, and he lacked postrelease plans and family support to ensure he could safely manage his behavior in the community.

## DISPOSITION

The order denying Peoples's petition for recall of his sentence and resentencing is affirmed.


                                                  FEUER, J.

We concur:


        PERLUSS, P. J.


        SEGAL, J.


17